CHANCELLOR, et al. *v.* MELVIN, et al.

Division A.   May 7, 1951.

No. 37953 (52 So. (2d) 360)

Heidelberg & Roberts, Beard, Pack & Ratcliff and Jack McDill, for appellants.

Deavours & Hilbun and Melvin & Melvin, for appellees.

Ethridge, C.

This is a controversy between materialmen and laborers, and the owner of a building constructed for him by a contractor. The former parties assert statutory liens on money owed the contractor by the owner. The principal problem is to determine the amount of the owner's unpaid balance on the construction contract.

Several weeks prior to October 1, 1948, appellee, cross-appellant and defendant below, Leonard B. Melvin, and M. C. Parker, a contractor, also a defendant below, had been negotiating for the construction by Parker of a small apartment house for Melvin on a lot owned by Melvin in the City of Laurel, Second Judicial District of Jones County, Mississippi. Parker originally offered to construct the apartment for $18,000, but after some negotiations Melvin and Parker executed on October 1, 1948, a written contract. Parker agreed to erect the building according to plans and specifications referred to, and "to furnish all materials of all kinds necessary for a complete lock and key job" for $17,000. The building was to be constructed in accordance with F. H. A. plans and specifications "under a commitment of $12,700.00 and the addi-

tional funds necessary to complete said building to be paid by Leonard B. Melvin . . . $3,500.00 on or before the completion of the job. Financial working plans to be worked out and agreed upon by the Commercial National Bank and Trust Company of Laurel, Mississippi.''

Parker began work on the building and completed it around January 5, 1949. On October 8, 1948, Parker obtained from Melvin $1,000 to be applied on the contract price, and similar amounts were obtained by him from Melvin on October 29 and November 18. On December 17 he obtained from Melvin $500. Receipts for the aforesaid advances by Melvin to Parker, totaling $3,500, were endorsed and signed on the construction contract by Parker. On January 5, 1949, Parker obtained from Melvin $750 and endorsed on the contract, ''Received of L. B. Melvin $750.00 which is to constitute full payment up to date, except $500.00 deferred payment to be paid by the month.''

Melvin testified that before the contract of October 1, 1948 was executed, Parker told him that if he could make arrangements for Parker to get the construction money in cash during the construction, Parker could build the house at a cheaper price and for $17,000; that Melvin went to Maddox, President of the Commercial National Bank and Trust Company of Laurel, and discussed the project with him, and Maddox, acting for the bank, agreed to finance the construction by loaning the money to Melvin. On October 14 Parker and Melvin executed a note to the bank for $3,000 and that amount was placed in the checking account of Parker and used by him. A note to the bank for $6,000 was executed by Parker and Melvin on October 21, and a note for $3,000 executed by them on November 12. In each instance the proceeds of these notes were deposited to the sole account of Parker who used the entire $12,000. Both Maddox, president of the bank, and Melvin testified that the loan was made solely upon the credit of Melvin, and the chancellor so found. Parker could not

have obtained this money on his own credit. The evidence is substantially undisputed to this effect. The chancellor found that the ''bank made the loan to Mr. Melvin'', although Melvin and Parker were co-signers of the note.

Parker checked on his account containing the proceeds of the $12,000 loan as he saw fit. He did not pay for all of the materials nor did he pay his subcontractors and materialmen in full. He kept practically no books and paid most of his bills in cash and not by check. Parker said that he lost on the Melvin job about $3,000, but appellants, complainants in the court below, who are material men and subcontractors, claim that the total amount owed to them on that job is $6,681.82. Some of the money that was paid by Melvin to Parker, although intended for labor and materials on Melvin's building, was not paid out for such materials and labor, but the chancellor correctly stated that there was no way of ascertaining from the evidence just how much of this money paid by Melvin to Parker, including the $12,000, was used by Parker to pay debts on other construction contracts incurred by Parker before he made Melvin's contract.

Since Parker had no books, he did not know how he was coming out on the Melvin job until after January 1, 1949. On the morning of January 14, Parker went to Maddox, president of the bank, and told him that he owed about $6,000 for materials and labor on the Melvin job, for which he had no funds to pay. Maddox told him to go see Melvin, which Parker did. He told Melvin the same thing. That afternoon Parker and Melvin discussed the matter with Maddox. At that time, one $3,000 note and one $6,000 note was past due, and the other $3,000 note became due on the next day, January 15. Parker testified that during the conference Melvin offered to pay him $1,200, less the interest due on the three notes, if Parker would give him a full receipt for the contract price, after Melvin had paid the notes. Parker admitted that that amount was the correct amount due him, but said that he refused to accept it because he didn't want to hurt the

materialmen's and laborers' claims. Parker then left the bank. Melvin decided to pay the notes. He did not have that amount of cash in his account at the bank, so he removed from his deposit box a number of United States Government Series E bonds and endorsed them for payment and deposit to his account. Maddox figured the interest due on the notes, and wrote a check payable to the bank for $12,176.50. Melvin signed it and handed the endorsed bonds and completed check to Maddox. Interest on the U. S. bonds was not calculated until Thursday, January 20, and Melvin's account at that time was credited with $12,360. Maddox said the check was paid on January 20, when cash for the bonds was received from the bank in New Orleans and the deposit receipt to Melvin's account was dated January 20. The notes reflect an entry on their face: "Paid by L. B. Melvin January 14, 1949," which Melvin said was made on that date. Maddox said that he does not recall when he wrote that receipt on the three notes, but was definite that he "considered the notes as having been paid as of the 14th." However, he added interest on them until the 20th. If Melvin had wanted the cash for the bonds at that time, and it had been during banking hours, Melvin could have obtained the cash. On January 20 Melvin came to the bank and picked up the cancelled notes and the deposit receipt. In the meantime, on January 17, the Hattiesburg Lumber and Supply Company, a materialman claiming that Parker owed it $3,056.12, gave to Melvin statutory notice of Parker's debt to it. The only other appellant who gave such notice was Holloway Electric Company, on January 17. See McNair v. M. L. Virden Lumber Company, Inc., 1942, 193 Miss. 232, 4 So. (2d) 684.

On May 31, 1949, Chancellor and others, doing business as the Hattisburg Lumber and Supply Company, filed a bill of complaint in the Chancery Court of the Second Judicial District of Jones County, charging that Melvin owed Parker $13,200, that they had given Melvin notice of their materialmen's claim, that the money was subject

to their lien under Miss. Code of 1942, Sec. 372, and prayed for a judgment against Parker and Melvin in the amount owed the company and for a lien on those funds in Melvin's hands for that amount. Other claimants were made defendants along with Parker and Melvin, but in their answers they asserted their claims as parties complainant against Parker and Melvin.

Melvin answered, denied the principal averments of the bill, asserted that he had paid Parker $4250 in cash, evidenced by receipts on the contract, and $12,000 at the time Melvin obtained that loan from the bank and that amount was deposited to Parker's account or in the alternative Parker was paid on January 14; that Parker was also obligated to pay the interest on that loan which Melvin had paid the bank; that therefore Melvin had paid Parker $16,426.50 and owed him the balance on the $17,000 contract, $573.50, which Melvin tendered into court. The chancellor held that Melvin had paid Parker $3,500 cash as evidenced by receipts on the contract, and $12,000 when that amount was deposited to Parker's account in October and November, 1948. He refused to allow Melvin credit on the contract for the $750 cash payment of January 5, 1949, which he found was for extra work and for work on Melvin's residence, and also refused to allow Melvin credit for the interest payment on the $12,000 notes. Hence, the court held that Melvin still owed Parker $1,500 under the construction contract and imposed a lien upon the apartment house and that amount for appellants. A decree was rendered against Parker for the entire amount of his debt to appellants. From this decree, the materialmen and laborers, complainants below, appeal, and Melvin, defendant below, cross-appeals as to the amount he owed Parker. Parker, who was present at the trial and testified but who filed no answer, did not appeal.

The lien claim of appellants is based upon Miss. Code of 1942, Sec. 372, which provides in part as follows: "Subcontractors, laborers, may bind the amount due the

contractor by written notice.—When any contractor or master workman shall not pay any person who may have furnished materials used in the erection, construction, alteration, or repair of any house, building, structure, fixture, boat, water craft, railroad, railroad embankment, the amount due by him to any subcontractor therein, or the wages of any journeyman or laborer employed by him therein, any such person, subcontractor, journeyman or laborer may give notice in writing to the owner thereof of the amount due him and claim the benefit of this section; and, thereupon the amount that may be due upon the date of the service of such notice by such owner to the contractor or master workman, shall be bound in the hands of such owner for the payment in full, or if insufficient then pro rata, of all sums due such person, subcontractor, journeyman or laborer who might lawfully have given notice in writing to the owner hereunder, and if after such notice, the contractor or master workmen shall bring suit against the owner, the latter may pay into court, the amount due on the contract; . . . In case judgment shall be given against such owner, such judgment shall be a lien, from the date of the original notice, and shall be enforced as other liens provided in this chapter. The owner shall not be liable in any event for a greater amount than the amount contracted for with the contractor.''

This particular statute was first passed in 1880. Miss. Code 1880, Sec. 1381. However, Mississippi had a mechanics' lien act as early as 1838. See Kirk v. Taliaferro, 1847, 8 Smedes & M. 754; Andrews v. Washburn, 1844, 3 Smedes & M. 109. ▮▮ The lien under Sec. 372 is purely a creature of statute and did not exist at common law. In its absence materialmen and laborers would be only general creditors of the contractor. 57 C. J. S., Mechanics' Liens, Section 1. ▮▮ Although the statute should be construed liberally to effectuate its purposes, laborers and materialmen have no lien on the money owed by the owner to the contractor until they give the

statutory stop notice to the owner. Citizens' Lumber Company v. Netterville, 1924, 137 Miss. 310, 102 So. 178; Lake v. Brannin, 1907, 90 Miss. 737, 44 So. 65; Code of 1942; Sec. 372. Two systems of liens have been adopted by statutes in various states for the protection of materialmen and laborers. One is known as the Pennsylvania system. It confers a direct and independent lien, irrespective of the rights of the principal contractor. ██ ██ The other system, called the New York system, which is that created by Section 372, confers a lien by subrogation to the rights of the independent contractor. The materialmen or laborers under such a statute are entitled to a lien only when the contractor is entitled to one, and there is something due or to become due to the principal contractor from the owner. Spengler v. Stiles-Tull Lumber Company, 1909, 94 Miss. 780, 800-816, 48 So. 966; 57 C. J. S., Mechanics' Liens, Sections 105-110.

██ ██ Melvin had no contractual dealings with the appellants. His fixed fee contract of $17,000 was with Parker alone for a completed job of construction. Appellants admitted that their dealings for their commodities and services were only with Parker and that they looked to Parker for their money. Hence appellants have no contractual rights against Melvin. Their claims are based solely upon Code Sec. 372, and by subrogation upon whatever rights Parker had against Melvin when the stop notices were served on Melvin. These notices were served on January 17, 1949.

Prior to that day, Parker admittedly had received from Melvin under the contract the following cash payments, the receipts for which were endorsed on the contract: October 8, 1948, $1,000; October 29, 1948, $1,000; November 18, 1948, $1,000; December 17, 1948, $500. This is a total of $3,500, omitting for the present a discussion of the cash payment of $750 on January 5, 1949.

██ ██ We also think that Melvin paid Parker $12,000 when Melvin borrowed that sum from the bank and had

it deposited to Parker's account with Parker's approval, and Parker accepted the deposit of that sum as such payment and used those funds. This was an amendment to the written contract. The evidence clearly demonstrates that this was the purpose and intention of Melvin and Parker, and the chancery court was correct in so finding. In other words, Melvin paid Parker $12,000 on his contract with him as follows: $3,000 on October 14, 1948; $6,000 on October 21, 1948; and $3,000 on November 12, 1948. Upon the execution of each of these three notes, the proceeds were deposited to the credit of Parker on the date the notes were respectively dated. It is true that Parker was a co-signer of the notes with Melvin, but the effect of this transaction must be determined, not from that fact alone, but from all of the circumstances and the intent of the parties to the contract. Several significant factors support the trial court's finding that the $12,000 was paid to Parker when this money was deposited to Parker's individual account. The evidence is overwhelming that this money was loaned by the bank to Melvin on his credit alone, and that Parker could not have obtained such a loan. This is confirmed by the testimony of Maddox, president of the bank, and by Melvin and Parker, and the chancellor so found. The borrowed money was in effect Melvin's money. He had it deposited to Parker's account and it was used by Parker. This constituted payment of that sum, $12,000, under the contract.

At about the time the contract was executed, Parker told Melvin that if Melvin could make arrangements for Parker to get the money in cash to spend, so that he would not have to wait for it until an F. H. A. loan was closed, he could build the house cheaper, and that accordingly the contract price was reduced from $18,000 to $17,-000. Melvin went to see the president of the bank and arranged for a loan and cash advances to Parker on Melvin's credit. Parker testified that ''Mr. Melvin's credit was good and so they took it without a deed of

trust . . ." He admitted that he had told Melvin that a house could be built cheaper with cash, and "that is where I agreed by him financing it I could cut the price." Parker said that he "received the money as payments on the contract." Parker said that Melvin only owed his $1,200 under the contract, and that if he had accepted Melvin's offer on January 14 for that amount, he "would have been paid in full." This claim of Parker's, although not binding upon appellants, is significant as evidencing Parker's interpretation of his contract, and is inconsistent with any other conclusion than that he considered that he had already been paid $12,000 in October and November 1948, when the money was deposited to his account from the loan obtained by Melvin.

This construction is further confirmed by the receipt for $750 signed by Parker on January 5 and endorsed on the contract, which recited that it "is to constitute full payment up to date, except $500.00 deferred payment to be paid by the month." Although (as we shall subsequently explain) the chancellor's finding that the $750 payment was not upon this contract is here affirmed, nevertheless, the reference to "full payment up to date" is inconsistent with any other conclusion than that Parker, as well as Melvin, considered that he had already been paid the $12,000, as well as the other cash advances endorsed upon the contract.

This conclusion is also supported by a memorandum, offered in evidence by appellants, which was prepared in Parker's handwriting on the night of January 14th, after he had discussed with a clerk at the bank the amount of interest apparently due upon the notes. Parker prepared that memorandum for the purpose of ascertaining how much he would owe on the house after he received payment for the balance due on the contract from Melvin. It listed bills which Parker owed to nine materialmen and laborers, in the total amount of $7,204.16, from which Parker subtracted a "credit" of $1,034.16, leaving a

balance he owed of $6,170. Parker testified that he thought Melvin owed him $1200, and that he subtracted from it the interest due on the notes, which left a credit due him from Melvin remaining under the contract of $1,034.16. This memorandum supports the inference that Parker as well as Melvin understood that he had already been paid the $12,000 as well as the cash payments endorsed on the contract.

In brief, the evidence overwhelmingly supports the chancery court's finding that Melvin and Parker had amended their construction contract so that Parker would get cash money during the construction, and that it was the intent of the contracting parties that the $12,000 obtained on Melvin's credit and given to Parker constituted a pro tanto payment on the contract when delivered to Parker. Moreover, a contrary result, in accordance with appellants' argument, would be beyond the terms of Melvin's agreement with Parker, and could result in Melvin paying him the $12,000 twice, or a total payment for a $17,000 house of $29,000. We would not be inclined to apply a result so highly penal unless it were clearly shown that Melvin violated his contract for the purpose of defrauding appellants, and there is no evidence whatever in the record to support either of these prerequisites.

In the absence of a statutory provision to the contrary, the owner may make payment to his principal contractor in any method and at any time they agree upon. Rockel, Mechanics' Liens (1909), Sec. 67; 57 C. J. S., Mechanics' Liens, Section 251. There are numerous cases in which the owner was held to have paid his contractor by giving him in good faith a promissory note for the amount due on the contract, even though the note was not paid until after stop notices had been given to the owner. McGranahan Lumber Co. v. Pyramid Asbestos & Roofing Co., Tex. Civ. App. 1929, 18 S. W. (2d) 224; Cramer v. Dallas Lumber Co., Tex. Civ. App. 1926, 283 S. W. 596; George E. Sealy Co. v. Ards Building

Corp., 1926, 216 App. Div. 313, 214 N. Y. S. 768, affirmed in 1927, 244 N. Y. 505, 155 N. E. 899.

In Lake v. Brannin, 1907, 90 Miss. 737, 44 So. 65, it was held that, where an owner prior to an attempt to create liens by anyone assumes a legal obligation to pay subcontractors or materialmen for labor or material used in the erection of a building, the obligation, to the extent thereof, constitutes a valid payment on the contract. A similar result was reached in Citizens' Lumber Co. v. Netterville, 1924, 137 Miss. 310, 102 So. 178. There is no substantial difference between the reduction of a debt owed a contractor by the owner assuming a part of that debt to materialmen, and a reduction of a debt under the contract to the contractor by the owner borrowing money on his credit alone and giving it to the contractor, as was done here. This latter and present situation is a stronger one supporting the owner's position for credit than was that in the Lake and Netterville cases.

Smith v. Merriam and Pinkerton, 1873, 67 Barb., N. Y., 403, is somewhat similar to the present case. There the owner and contractor had a written agreement to construct a home for a fixed price. Apparently the contractor needed some cash, so he executed notes which were endorsed by the owner, and the contractor obtained the cash on them. In a suit by a materialman seeking to enforce a lien, the owner claimed and was allowed credit for the amount of the notes of the contractor which he had endorsed and paid. It appears that the notes were paid by the owner before notice of lien was given, but the following statement by that Court is significant: ". . . there was nothing due from the defendant Merriam to the contractor Pinkerton. It was not absolutely necessary that the notes should have been charged up in the account; it is enough to know that Pinkerton had received the money upon the notes, or credit for them; that Merriam had become indisputably liable to pay them, in virtue of his agreement and indorsement thereof. It was an agreement made by him

to pay his debt in a particular mode, and was binding upon him. (Lawrence v. Fox, 20 N. Y. 268. 43 Barb. 522, 4 N. Y. 233). From the time such agreement was made to pay the two notes, as well as from the time of their actual payment by Merriam, he was entitled to have them treated as payments upon the building contract existing between him and Pinkerton.''

Also somewhat analogous are those cases where the owner had guaranteed payment of the price of materials used by the contractor in the construction, and the Court allowed the owner to deduct that amount from the contract price in a suit by other materialmen. In Thomas & Co. v. McCauley, 1926, 143 Va. 451, 130 S. E. 396, 398, the Court said that ''we should not regard it as material whether payment had been actually made or simply guaranteed . . .'' Schrieber v. Citizens' Bank, 1901, 99 Va. 257, 38 S. E. 134; Garrison Grain & Lumber Co. v. Farmers Mercantile Co., 1917, 181 Iowa 568, 164 N. W. 791; Gibson v. Lenane, 1883, 94 N. Y. 183; Garrison v. Mooney, 1880, 9 Daly, N. Y., 218. Where the owner has assumed in good faith and with the agreement of the contractor an obligation of the contractor, even though the contractor is secondarily liable thereon, these cases seem to hold that the owner is entitled to credit for the amount of the assumed obligation on his contract price as against materialmen asserting liens. Even clearer is the present situation, where the owner obtained the money on his credit and paid it to the contractor under an agreement between them that it would be applied upon the contract price.

For the above reasons, we do not need to consider whether the notes upon which Parker obtained his money in October and November, 1948 were paid by Melvin on January 14 or 20th. Although the original contract provided for an F. H. A. commitment and insured loan, the evidence shows that the parties, by mutual agreement, amended their contract so as to eliminate that pro-

vision. Moreover, it has no relevance on the issue of when Parker was paid on the contract.

The trial court disallowed Melvin's claim for the cash payment by him to Parker on January 5 of $750 as a credit upon the contract obligation, and found that that sum was paid Parker for debts other than those incurred by the written contract, including $450 for work on Melvin's residence and $300 for extra work on the apartment building. The record is sufficient to support the chancellor's finding of fact on that issue. The fact that Parker filed no pleadings and does not claim in any pleadings credit for extra work does not preclude appellants from explaining that the $750 cash payment of January 5 does not cover items under the contract. A receipt can be explained by extrinsic evidence. Dewees v. Bostwick Lumber & Mfg. Co., 1909, 96 Miss. 253, 50 So. 865; Blacketor v. Cartee, 1935, 172 Miss. 889, 161 So. 696.

However, we think the chancery court erred in not allowing Melvin credit for the interest on the three notes aggregating $12,000, the proceeds of which were given to Parker in payment on the contract. The contract was amended so that Parker could obtain this money in cash during the construction of the building, and for that reason Parker agreed to pay the interest ($176.50) which would accrue on those notes. This is confirmed by Parker's testimony and by his handwritten memorandum of January 14th.

The fact that Parker in his testimony limits his claim against Melvin to $1,200 does not preclude these third parties, the materialmen and laborers, appellants, from showing that in fact he is mistaken and that Melvin owes on the contract more than that amount. If Parker were the only party controverting this matter with Melvin he would be limited by his claims, but appellants are third parties with statutory liens and were entitled to show the correct amount owed by Melvin. Parker's testimony as to the amount owed him was based

upon his erroneous conception that only $500 was due him plus $700 under the F. H. A. commitment, which latter factor has no relevance on the amount Parker was entitled to.

In brief, Melvin has paid Parker on his contract, $12,000 plus $3,500 cash payments endorsed on the contract, and is entitled to a credit for the interest on the notes in the amount of $176.50, being a total payment of $15,676.50. Hence he still owes Parker $1,323.50, upon which he is entitled to credit for $573.50, which he has already paid into the registry of the court. Appellants are entitled to a lien upon the balance due.

The case is therefore affirmed on direct appeal, and on cross-appeal by Melvin is affirmed in part and reversed in part as to the amount of the lien, and judgment accordingly. All costs of this appeal will be assessed against the direct appellants.

Affirmed on direct appeal; on cross-appeal affirmed in part and reversed in part as to amount of lien, and judgment accordingly.

PER CURIAM.

The above opinion is adopted as the opinion of the Court, and for the reasons therein indicated, it is affirmed on direct appeal, and on cross-appeal is affirmed in part and reversed in part as to amount of lien, and judgment accordingly.