791 So.2d 254 (2000)
CHIC CREATIONS OF BONITA LAKES MALL d/b/a Chic Wigs, Appellant,
v.
DOLEAC ELECTRIC COMPANY, INC., McClain Plumbing and Electrical, Inc. and Auto-Motive Glass Specialist of Weathersby Road d/b/a Auto Glass/City Glass, Appellees.
No. 1999-CA-01400-COA.
Court of Appeals of Mississippi.
November 28, 2000.
Rehearing Denied February 27, 2001.
*255 Wayne Dowdy, Magnolia, Attorney For Appellant.
Terry L. Jordan, Philadelphia; John L. Prichard; Richard A. Follis, Laurel; M. Ronald Doleac, Hattiesburg, Attorneys For Appellees.
EN BANC.
SOUTHWICK, P.J., for the Court:
¶ 1. A shopping mall developer filed an interpleader action naming as defendants one of the mall retailers, its general contractor and the subcontractors who had not been paid for their materials and labor in connection with the construction work on the retailer's store. The Lauderdale County Chancery Court found that the subcontractors were entitled to a pro-rata share of the interpleaded funds under the Mississippi stop-notice statute. The retail store appeals arguing that the statute is inapplicable. We agree, reverse and enter judgment for the retailer.

STATEMENT OF FACTS
¶ 2. Chic Creations, Inc. is a family owned corporation that operates retail stores throughout the South under the name of Chic Wigs. The stores primarily serve persons who have experienced hair loss due to chemotherapy treatments. For over twenty-five years Chic Wigs had operated a store in Village Fair Mall in Meridian. When a new mall was being constructed, *256 Chic Wigs contracted with the developer, CBL, to relocate the store to the newly developed Bonita Lakes Mall.
¶ 3. Chic Wigs and CBL executed a shopping center lease. CBL was to furnish an unfinished shell space in the mall. Chic Wigs agreed to finish the shell at its own expense. Once construction of the store was complete, CBL would pay Chic Wigs $25,000 as CBL's contribution to the total construction costs. The payment provision required that Chic Wigs first provide a performance bond as to the general contractor, a lien waiver from the general contractor executed by all subcontractors, and evidence that all payments for the construction of the store had been made. Chic Wigs owner acknowledged at the hearing that none of the contingencies was satisfied.
¶ 4. National Retail Construction contracted with Chic Wigs to complete construction on the store for $43,840.00. Subcontracts were entered by National Retail with the following companies for the stated amounts, but none of the companies have been paid: Doleac Electric, for $17,719.04; McClain Plumbing, for $3,400.00; Automotive Glass Specialists, for $6,903.64; Carpet mart Furniture World, for $1,978.00; and Boggan Concrete Services for $3,150.00.
¶ 5. Chic Wigs was to satisfy the contract price of $43,840.00 to National Retail in several payments. There was some evidence that four payments of $10,960.00 each were made by Chic Wigs to National Retail between the dates of August 29, 1997 and October 10, 1997. Chic Wigs occupied the new store by October 15, 1997 and at that time Chic alleges it owed nothing further to its general contractor, National Retail.
¶ 6. In early November, unpaid subcontractor Doleac Electric sent to the mall manager and to Chic Wigs a copy of a letter addressed to National Retail alleging that Doleac had yet to be paid for its work on the store. On February 10, 1998, Doleac sent another letter to the mall manager and Chic Wigs. Again it complained about not being paid and requested that the owner stop payment on any funds still owing to National Retail. According to the testimony of Chic Wigs' president, the entire contract amount had already been paid to National Retail four months prior to this letter. The trial testimony explained a letter sent by Chic Wigs to National Retail on November 14, 1997, that stated that as of that date only $32,880.00 of the total $43,840 had been paid. The trial testimony was that one of two different checks for $10,960 that were written on the same day had been overlooked.
¶ 7. The mall owner (CBL) interpleaded the $25,000 it was to pay Chic Wigs upon completion of the store. The suit named Chic Wigs, National Retail, and all of the subcontractors as defendants. The chancellor found that Chic Wigs had no claim to the funds because it had not satisfied all of its contractual conditions with CBL. The most important of those unsatisfied conditions were that Chic Wigs was to furnish a payment bond, to provide evidence that payment for all work done to the store had been made, and to obtain a lien wavier from all materialmen. The chancellor ordered that the funds be distributed pro-rata to the subcontractors. The chancellor also awarded an equitable lien on the materials used in construction at the store to cover amounts owed to the subcontractors that would not be satisfied by the division of the $25,000.

DISCUSSION

I. Interpleader procedure
¶ 8. The relevant rule for interpleader actions provides as follows:

*257 (a) Plaintiff or Defendant. Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joiner that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that he is not liable in whole or in part to any or all of the claimants. A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim. The provisions of this rule supplement and do not in any way limit the joinder of parties permitted in Rule 20.
The comments state that the purpose of Rule 22 is to allow a stakeholder to obtain a judicial determination of the proper distribution of funds held by the stakeholder who is uncertain to whom he is liable. The comments further state that the principal consideration in determining whether an interpleader is appropriate is whether the stakeholder legitimately fears the possibility of multiple claims against a single fund.
¶ 9. Based on the evidence in the record, CBL knew that the subcontractors had not been paid for their work on the Chic Wigs store. CBL's concern that it could be subjected to multiple litigation was reasonable. The validity of various claims was not for CBL to determine. It is the reasonable prospect of multiple claims to the fund that legitimizes the use of Rule 22.
¶ 10. The Rule 22 interpleader action provides only the procedural vehicle to assert claims to the specific funds. The rule by itself cannot be the basis for a pro-rata distribution. In order for the subcontractors to assert a valid claim to this fund they must do more than show that they are owed money by the contractor. They must demonstrate how they are entitled to a portion of this particular fund otherwise owing by CBL to Chic Wigs.
¶ 11. The shopping center lease obligated CBL to pay Chic Wigs the $25,000 if certain conditions were met. Chic Wigs did not satisfy many of the contractual conditions, but CBL chose not to raise its defenses to that payment. This suit is not one brought by Chic Wigs against CBL for the $25,000, with CBL then raising as defenses Chic Wigs' breach of the contract. The complaint filed by CBL relinquished all claims to the money and in March 1999, it was dismissed from the suit. CBL's actions waived any argument that the money was not in fact owed because of a breach by Chic Wigs. The parties other than Chic Wigs had claims at best that were derivative. Chic Wigs had every entitlement to the money unless it could be shown that the other defendants had a better claim.

II. Stop notice statute
¶ 12. The subcontractors argue and the chancellor found that the Mississippi stop notice statute gives them a claim against the funds. The statute permits subcontractors or materialmen who have not been paid by the contractor to file a notice that requires the owner to retain any funds it still holds that otherwise would be paid to the contractor:
When any contractor or master workman shall not pay any person who may have furnished materials used in the erection, construction, alteration of any house, building, structure ... the amount due by him to any subcontractor therein ... any such person, subcontractor,... may give notice in writing to the owner thereof of the amount due him and claim the benefit of this section; and, thereupon the amount that may be *258 due upon the date of the service of such notice by such owner to the contractor..., shall be bound in the hands of the owner for the payment in full, or if insufficient then pro rat[a].
Miss.Code Ann. § 85-7-181 (Rev.1999).
¶ 13. In holding that this statute entitled National Retail's unpaid subcontractors to a pro-rata share of the funds, the chancellor found that the owner was CBL and that Chic was the contractor. That would have to mean that the unpaid parties were Chic's subcontractors. They were not. These parties were National Retail's subcontractors, and that matters for the following reasons.
¶ 14. This statute has been narrowly construed. It applies only to materialmen or subcontractors of the general contractor. Subcontractors or materialmen to another subcontractor are not entitled to recovery under this statutory provision. Associated Dealers Supply, Inc. v. Mississippi Roofing Supply, Inc., 589 So.2d 1245, 1247 (Miss.1991). Only those with a direct contractual relation with the owner's contractor can file an effective stop notice, and then only to require the retention of funds owed by the owner to the contractor. Stop notice allows a claim to be asserted against a specific fund, namely, money in the hands of the owner that otherwise would be paid to the contractor. If the owner has other project funds that are not owed by it to the contractor, the stop notice statute does not give subcontractors and materialmen a claim to that money. Yet that is what was allowed in this case. The $25,000 was not money in Chic's hands owing to National Retail, but money in CBL's possession owing to Chic.
¶ 15. The important fund here was the $43,840 that Chic had contracted to pay National Retail. What these unpaid parties were entitled to do is file a stop notice with Chic Wigs to prevent Chic from paying any remaining portion of the $43,840 it owed on its contract to National Retail. There was ambiguity about when or whether the last quarter of that amount was paid by Chic to National Retail. Indeed, Chic Wigs attorney was not allowed to introduce much of the evidence that he was offering as to any of the payments by Chic to National Retail. The chancellor made no finding regarding whether all the contract amount had been paid by Chic Wigs before any of these stop notices was received nor did she need to make any such finding based on the issues raised with her.
¶ 16. These questions of what money was paid by Chic under its contract to National Retail are simply irrelevant here. The focus of the parties and the court was solely on the $25,000 paid into the registry of the court by the mall owner, CBL. Any separate obligation that Chic Wigs might have was not questioned in this litigation. The answer to what was in question was that the stop notice statute did not give the subcontractors and materialmen a claim to the $25,000 in the possession of someone entirely outside the owner-contractor-subcontractor hierarchy.

III. Third Party Beneficiary
¶ 17. The subcontractors and materialmen also argue that they are third party beneficiaries of the lease agreement between CBL and Chic Wigs. A third party may enforce a contractual provision included primarily for his benefit even though he was not a party to the contract. Burns v. Washington Savings, 251 Miss. 789, 171 So.2d 322, 324 (1965). Such a third party is entitled to enforce a breach of a contract "only when the condition which is alleged to have been broken was placed in the contract for his direct benefit. A mere incidental beneficiary acquires *259 by virtue of the contractual obligation no right against the promisor or promisee." Hartford Accident & Indemnity Co. v. Hewes, 190 Miss. 225, 199 So. 93, 95 (1940).
¶ 18. These parties allege that the contractual provisions breached by Chic Wigs pertaining to, among other things, the securing of a payment bond, was intended for the direct benefit of the subcontractors in order to make sure that they were paid for their materials and labor. The Chancellor found and we agree that the primary purpose of these provisions was to avoid liens being filed on the Bonita Lakes Mall property. This was a contract between CBL and Chic Wigs and the provisions were intended to benefit the Bonita Lakes Mall. National Retail's subcontractors and materialmen would have benefitted had Chic Wigs performed all of its contractual obligations, but the benefit would have been merely incidental to the primary purpose which was the avoidance of liens on the property. We find no error in the chancellor's denial of relief under this argument.

IV. Equitable Lien
¶ 19. The Chancellor also held that the appellees were entitled to an equitable lien against the fixtures and furnishings placed in the Chic Wigs store. This equitable lien was to cover amounts owed for work on the store above the amount received from the interpleaded funds.
¶ 20. We find no basis for creating this lien. Contractors are entitled to a lien on the property if they are not paid for their services and materials. Miss.Code Ann. § 85-7-131 (Rev.1999). The stop notice statute provides a remedy for subcontractors and materialmen. Miss.Code Ann. § 85-7-181. These separate remedies perhaps can be criticized on a policy level, but it is settled that this distinction has been made by the statutes. Indeed, if not for the stop notice statute, materialmen and laborers would be mere general creditors of the contractor. Chancellor v. Melvin, 211 Miss. 590, 52 So.2d 360, 364 (1951). The rights that such parties do have are these:
(1) Under a building contract such as here involved subcontractors, laborers and materialmen, who have dealt only with the prime contractor, have no lien on the money owed by the owner to the contractor until the statutory stop notice is given in accordance with Code Section 372; (2) if nothing is then owing by the owner to the contractor, the subcontractors, laborers and materialmen have no lien on the property nor any valid claim against the owner for the debts owing to them by the contractor; (3) even though the contract does not require that the owner pay anything before completion of the job, the owner may nevertheless make advances to the principal contractor during the progress of the work in any method and at any time they may agree upon and he will be protected in so doing.
Williams v. Taylor, 216 Miss. 563, 569, 62 So.2d 883, 885 (1953). No lien arises "if nothing is then owing by the owner to the contractor...." The chancellor cannot by labeling it an equitable lien, provide subcontractors a lien to which they are not statutorily entitled.
¶ 21. The only issue raised by the parties in their pleadings, the only arguments made before the court, and the only matter resolved by the chancellor was which parties were entitled to the $25,000. The only judgment proper in this case as presented by the parties was for the $25,000 to be paid to Chic Wigs. Should in other litigation it be shown that Chic Wigs in fact did as owner have money in its hands owing to National Retail as contractor at the time that it received a stop notice, then the *260 entire panoply of rights that arise under the stop notice statuteincluding the creation of a liencan be considered as to that money.
¶ 22. THE JUDGMENT OF THE CHANCERY COURT OF LAUDERDALE COUNTY IS REVERSED AND JUDGMENT IS RENDERED FOR THE APPELLANT. ALL COSTS ARE ASSESSED TO THE APPELLEES IN EQUAL SHARES.
McMILLIN, C.J., KING, P.J., BRIDGES, IRVING, LEE, MOORE, AND THOMAS, JJ., CONCUR.
PAYNE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MYERS, J.
PAYNE, J., dissenting:
¶ 23. I must dissent to the majority opinion because I think the majority is seeing the "trees" but failing to see the entire "forest". Particularly, the majority fails to recognize that Chic never even took those steps necessary to render it entitled to the $25,000, and one cannot receive a share of interpled funds if it cannot assert a valid right to those funds.
¶ 24. "An interpleader action is governed by equitable principles and rules." 45 Am-Jur 2d § 13 (1999). According to one textbook, "The proceeding permits a person who is ready to perform a duty to determine to who[m] such duty is owed." Edward D. Re & Joseph R. Re, Cases and Materials on Remedies, 342 (4th ed.1996).
¶ 25. Ordinarily, interpleader is conducted in two stages. With the first stage of an interpleader suit, the stakeholder deposits the contested funds with the court for the court to determine if the stakeholder, indeed, is entitled to interpleader relief. At this stage, the court examines the facts only so far as necessary to determine whether interpleader relief is necessary. If no evidence is found, then interpleader is not permitted. If the court grants the stakeholder the right to interpleader, the stakeholder is released from the suit if he is disinterested, and the court likely will render the stakeholder exempt from liability with regard to the interpled funds. See 45 AmJur 2d § 13 (1999); M.R.C.P. 22 cmt.; McClintock on Equity, § 188 (2nd ed.1948).
¶ 26. After the stakeholder has interpled the funds, the second stage of interpleader requires each claimant to demonstrate his right of claim to the funds deposited with the court. Id. The claimant must sufficiently set forth the claims of the proposed contestants in order for the court to give the other claimants proper notice. Warner's Griffith Chancery Practice § 422 (Rev.1991). After the claimants have been identified, the case proceeds as any other civil suit, often including a trial to determine the amount of interpled funds to which each claimant is entitled.
¶ 27. The law having been cited, we look to the present case. First, as a stakeholder, CBL went through the steps to get interpleader relief. Thus, I find that CBL was properly released from liability and I would affirm the chancellor's decision to do so. The majority contends that since CBL did not raise any defenses to Chic's failure to meet the contractual conditions, CBL waived any defense it may have had to Chic's claim to the money. I find this theory unfounded and contrary to the previously cited principles.
¶ 28. As a claimant, Chic had the responsibility of proving it was entitled to the interpled funds. Chic's contract with CBL permitted Chic to get the $25,000 only if Chic attained a payment bond, got a lien waiver from all subcontractors, and gained affidavits that the work had been done. Since the record in undisputed that Chic *261 did none of these, Chic never gained a right to the money and, consequently, cannot claim a valid right in the interpled funds. Contrary to the majority's opinion, I do not find that Chic gained such right merely because CBL was excused from the litigation via its interpleading the $25,000. I would agree with the chancellor's finding that Chic should receive zero of the interpled money.
¶ 29. I also dissent to the majority opinion's treatment of Miss.Code Ann. § 85-7-181 (Rev.1999), as described in the second issue. According to this code section, if the subcontractors are not paid, they can give notice to the owner who can then withhold funds owed by him to the general contractor and can in turn pay the subcontractors with those funds. The majority claims that this code section can not be used to allow the subcontractors to access the $25,000 that is allegedly due to Chic. As stated before, though, Chic was not due any funds because it had not met those conditions set forth in its contract with CBL. Therefore, any question concerning the subcontractors's rights to these funds, as supposedly vested in Chic's ownership, is improper since Chic had no right to the funds.
¶ 30. I fear that the majority's reading of the facts in this case narrows the applicability of this code section beyond what is necessary. The majority states that the chancellor erred in finding that CBL was the owner and that Chic was the contractor when in fact the subcontractors were actually National Retail's subcontractors, and not Chic's. This means that since the $25,000 was owed by CBL (the owner) to Chic (the lessee), these funds were unreachable by the subcontractors due to the strict privity requirements of this code section. I find this construction of the statute to set up much too high a hurdle to leap. In a case such as this (aside from the fact that the $25,000 in funds were not Chic's to be reached) as a lessee Chic, who owed the contractor funds for the construction, stood in the place of the "owner" for purposes of the statute and should have been given the notice, rather than CBL.
¶ 31. If I am understanding the majority's rationale correctly, there is no way that protection under the stop notice statute could ever have been available to these subcontractors. The subcontractors could not file notice with the owner, CBL, because he did not hold any funds due the contractor; they could not file notice with Chic, the lessee who owed money to the contractor because the lessee was not the owner. In effect, unless we consider the lessee as standing in the shoes of the owner, contractors in circumstances like this would never have any incentive to pay subcontractors as none of their funds could ever be in jeopardy of a stop payment notice.
¶ 32. With the majority opinion's interpretation of this section, we have created a perfect formula for undoing a remedy that the legislature meant to provide to subcontractors. This leaves the door open for subcontractors to be left with no chance at payment, which I find is an altogether incorrect reading of the statute. For this and the other reasons stated herein, I dissent to the majority's opinion.
MYERS, J., JOINS THIS SEPARATE WRITTEN OPINION.