# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI

### NO. 98-CA-00762-COA

**AMERIHOST DEVELOPMENT, INC.**                                                **APPELLANT**

**v.**

**BROMANCO, INC.; K & K BATHTUB REPAIR; DIAMOND DOOR GROUP, INC.; DEER PARK FENCE & INSULATION CO.; GREY PLUMBING, INC.; S & L CREATIVE CARPET; VICKSBURG PAINT & GLASS COMPANY; PRECISION ROOF SERVICES, INC.; VINZANT CONSTRUCTION; CONTROLLED AIR COMFORT COMPANY; SOUTHERN ELECTRIC SUPPLY COMPANY, INC.; WRIGHT'S PAINTING; BRUCE COPES ELECTRICAL, INC.; METROPOLIS BUILDERS SUPPLY; PARADISE POOLS & SPAS; BARRY LANDSCAPE, INC.; UNITED PIPING, INC.; UPTON PLASTERING; MID- SOUTH LUMBER & SUPPLY, INC.; W. J. RUNYON & SON, INC.; TESA/ENTRY SYSTEMS, INC. AND GEE & STRICKLAND, INC.**                                                **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 4/15/1998 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PHIL B. ABERNETHY |
| | JEFFREY TODD WAYCASTER |
| | RICHARD M. DYE |
| ATTORNEYS FOR APPELLEES: | ROBERT BAILESS |
| | CHARLES L. BALCH III |
| | JAMES L. PENLEY JR. |
| | LUCIUS B. DABNEY JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| TRIAL COURT DISPOSITION: | CASINO HELD LIABLE TO SUBCONTRACTOR FOR AMOUNTS PAID TO GENERAL CONTRACTOR FOLLOWING STOP PAYMENT NOTICE GIVEN BY SUBCONTRACTOR |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART AND REVERSED AND RENDERED IN PART - 02/08/2000 |
| MOTION FOR REHEARING FILED: | 02/22/2000 - denied 06/20/2000 |
| CERTIORARI FILED: | |
| MANDATE ISSUED: | |

BEFORE McMILLIN, C.J., IRVING, AND THOMAS, JJ.

THOMAS, J., FOR THE COURT:

¶1. Amerihost Development, Inc. appeals the judgment of the Circuit Court of Warren County, raising the following assignments as error:

> **I. WHETHER A SINGLE STOP PAYMENT NOTICE EXERCISING THE RIGHTS OF ONE SUBCONTRACTOR PURSUANT MISS. CODE ANN. § 85-7-181 CONFERS THE BENEFITS AND PROTECTIONS OF SAID STATUTE UPON ALL SUBCONTRACTORS AND SUPPLIERS REGARDLESS OF WHETHER EACH SUBCONTRACTOR OR SUPPLIER INDIVIDUALLY PROVIDED NOTICE OF THEIR RESPECTIVE CLAIMS.**

> **II. WHETHER THE TRIAL COURT ERRED IN AWARDING PRE AND POST-JUDGMENT INTEREST OF FUNDS INTERPLED AND ON DEPOSIT WITH THE COURT CLERK.**

> **III. WHETHER THE TRIAL COURT ERRED IN ITS AWARD OF ATTORNEYS' FEES.**

¶2. Bruce Copes Electric, Inc., on cross-appeal, appeals the judgment of the Circuit Court of Warren County and raises the following assignment as error:

> **IV. WHETHER THE TRIAL COURT ERRED IN FINDING THAT BRUCE COPES ELECTRIC, INC. WAS NOT ENTITLED TO ANY OF THE FUNDS INTERPLED.**

¶3. As to the appeal of Amerihost Development, Inc., finding reversible error, we reverse and render in part and reverse and remand in part. As to the cross-appeal of Bruce Copes Electric, Inc., finding no error, we affirm.

## FACTS

¶4. Amerihost Development, Inc., an Illinois corporation licensed to operate in Mississippi, is the owner and developer of a construction project known as Days Inn, Rainbow Park, in Vicksburg, Mississippi. On July 25, 1994, Amerihost entered into a construction contract with the Ohio corporation Bromanco, as general contractor of the hotel project. The original lump sum contracted price of the project was $1,971,977. However, as the project progressed change orders increased the original contracted price to a new total of $2,011,082.83. Amerihost solely financed the project; therefore, no construction lender was involved. Amerihost made irregular inspections of the project site through its personnel, but nevertheless trusted and relied heavily on Bromanco's expertise as the general contractor. The contract specified that periodic progress payments would be made to Bromanco as the project progressed minus a ten percent retainage. The contract required that Bromanco submit periodic applications for payment with stated completion percentages and the appropriate lien waivers prior to Amerihost's remittance of payment. A total of eight progress payments were made to Bromanco between October 13, 1994 and April 30, 1995. Initially Bromanco provided the appropriate applications and the project progressed without any apparent problems of major significance. However, as the project neared completion Bromanco began to submit applications for payment without complete lien waivers and in fact submitted some duplicate lien waivers. Yet, no stop notices were sent during this period to Amerihost by any subcontractors, materialmen, or

suppliers until mid April 1995.

¶5. On April 17, 1995 Amerihost received a statutory stop payment notice pursuant to Miss. Code Ann. § 85-7-181 (1972) in the amount of $25,000 from Wright's Painting Company, one of the subcontractors hired by Bromanco. The dispute between Wright, Amerihost, and Bromanco was subsequently resolved without Wright having ever participated in the instant action. On April 30, 1995, Bromanco submitted its last application for payment on the project in the amount of $272,819.13. On May 5, 1995, Amerihost received a notice letter from Southern Electric Supply Company informing Amerihost that they had not been paid approximately $30,881.56 by Bromanco and that said letter should be considered Southern's notice under applicable state statutes and a demand for immediate payment. The two stop payment notices received from Wright's Painting and Southern Electric totaled approximately $55,881.56. On May 15, 1995, Amerihost paid Bromanco the $272,819.13 requested on April 30, 1995, but Amerihost still retained approximately $110,330.20. Despite that the project was substantially complete, Bromanco nevertheless defaulted as general contractor and failed to complete the project. As a result Amerihost hired its own work force to finish the project and expended approximately $19,844.62 of the retainage to complete the project leaving a retainage of $90,485.58.

¶6. Between May 15, 1995 and November 15, 1995, Amerihost received numerous stop payment notices and/or bills of account from several of the subcontractors and materialmen originally hired by Bromanco to work on the project. Consequently, on November 15, 1995, Amerihost interpled the remaining retainage of $90,485.58 into the registry of the Warren County Circuit Court.

## ANALYSIS

### I.

### WHETHER A SINGLE STOP PAYMENT NOTICE EXERCISING THE RIGHTS OF ONE SUBCONTRACTOR PURSUANT MISS. CODE ANN. § 85-7-181 CONFERS THE BENEFITS AND PROTECTIONS OF SAID STATUTE UPON ALL SUBCONTRACTORS AND SUPPLIERS REGARDLESS OF WHETHER EACH SUBCONTRACTOR OR SUPPLIER INDIVIDUALLY PROVIDED NOTICE OF THEIR RESPECTIVE CLAIMS.

¶7. Amerihost argues that the trial court erred in its interpretation of Miss Code Ann. § 85-7-181. In reaching its decision, the trial court interpreted § 85-7-181 as conferring the rights stated within that statute upon all subcontractors, materialmen and suppliers who had worked on the project despite whether each had availed themselves individually of the express terms of that statute's notice requirements once the owner is in receipt of at least one notice from anyone of them. This interpretation does not take into account that the lone notice merely asserts that individual subcontractor's amount in controversy and is silent with respect to the individual claims, if any, of the other subcontractors, materialmen, and suppliers. Particularly, in this case two individual notices, each asserting its own distinct claims and nothing more, were sent by separate subcontractors and suppliers: Wright's Painting on April 17, 1995 and Southern Electric Supply on May 5, 1995. Both notices contained sufficient information under the stop notice statute, § 85-7-181, to qualify as notices under that statute. We quickly note that Southern Electric Supply was initially a supplier of a subcontractor, Copes Electric, rather than a supplier of the general contractor, Bromanco, and therefore not entitled to the protections of § 85-7-181. Material suppliers are general creditors in the absence of the afforded protections of § 85-7-181 covering subcontractors or materialmen of the general or prime contractor as subcontractors or materialmen to another subcontractor are not covered within the section.

*Associated Dealers Supply, Inc. v. Mississippi Roofing Supply, Inc.*, 589 So. 2d 1245, 1247 (Miss. 1991). However, by virtue of a joint payment agreement entered into on February 8, 1995 between Southern, Bromanco, and Copes Electric, wherein Bromanco gave assurances that future payments for materials would be made jointly between Southern and Copes Electric, Southern was elevated from a supplier of a subcontractor to a supplier of the general contractor. Southern's elevated status, however, does not afford them the protections contained in § 85-7-181 for materials supplied and expenses incurred prior to the February 8, 1995 agreement.

¶8. The trial court concluded, with regard to the first notice received on April 17, 1995, that once an owner/developer is presented with a single statutory stop payment notice by one subcontractor then that lone notice places the owner/developer on notice that something is potentially afoul with the entire project; therefore, all funds due the general contractor at the time the notice is received must be bound in the hands of the owner until the matter is resolved. Amerihost argues that under the trial court's interpretation those subcontractors, materialmen and suppliers who failed to adhere to the express terms of the statute are nevertheless allowed to unjustly piggyback on the lone stop payment notice submitted by Wright. Amerihost asserts that this interpretation not only is contrary to the intended purpose of the statute as supported within the statute's express language but is also contrary and counter to public policy considerations affecting the construction industry in Mississippi.

¶9. Mississippi Code Annotated § 85-7-181 (1972) is as follows:

> When any contractor or master workman shall not pay any person who may have furnished materials used in the erection, construction, alteration, or repair of any house, building, structure, fixture, boat, water craft, railroad, railroad embankment, the amount due by him to any subcontractor therein, or the wages of any journeyman or laborer employed by him therein, any such person, subcontractor, journeyman or laborer may give notice in writing to the owner thereof of the amount due him and claim the benefit of this section; and, thereupon the amount that may be due upon the date of the service of such notice by such owner to the contractor or master workman, shall be bound in the hands of such owner for the payment in full, or if insufficient then pro rata, of all sums due such person, subcontractor, journeyman or laborer who might lawfully have given notice in writing to the owner hereunder, and if after such notice, the contractor or master workman shall bring suit against the owner, the latter may pay into court, the amount due on the contract; and thereupon all persons entitled hereunder, so far as known, shall be made parties and summoned into court to protect their rights, contest the demands of such contractor or master workman and other claimants; and the court shall cause an issue to be made up and tried and direct the payment of the amount found due in accordance with the provisions hereof; or in case any person entitled to the benefits hereof, shall sue the contractor or master workman, such person so suing shall make the owner and all other persons interested, either as contractors, master workmen, subcontractors, laborers, journeymen or materialmen, so far as known, parties to the suit (and any such party not made a party in any suit hereunder authorized may intervene by petition), and, thereupon the owner may pay into the court the amount admitted to be due on the contract or sufficient to pay the sums claimed, and the court shall cause an issue to be made up and award the same to the person lawfully entitled; in either case the owner shall not be liable for costs; but if the owner, when sued, with the contractor or master workman, shall deny any indebtedness sufficient to satisfy the sums claimed and all costs, the court shall, at the instance of any party interested, cause an issue to be made up to ascertain the true amount of such indebtedness and shall give judgment and award costs, and reasonable attorney's fees,

according to the rights of the several parties in accordance herewith. In case judgment shall be given against such owner, such judgment shall be a lien, from the date of the original notice, and shall be enforced as other liens provided in this chapter. The owner shall not be liable in any event for a greater amount than the amount contracted for with the contractor.

The provisions of this section allowing the award of attorney's fees shall only apply to actions the cause of which accrued on or after July 1, 1987.

¶10. In arguing its interpretation of § 85-7-181, Bromanco, Inc. places great weight on the legislative history of the section, specifically the amendments to the 1906 Code by the 1918 Act. The present statute is essentially the same as that which was amended by the 1918 Act. Bromanco argues that with the language additions contained in the 1918 Act, so also came the legislative intent to broaden the statute's protections to include all members of the protected class of materialmen and subcontractors once a single notice is sent and received. Under Bromanco's interpretation, the first solitary notice asserting one member's individual right of lien is also for the benefit of all subcontractors, suppliers, and laborers who had the right to file a stop notice, but failed to actually file their respective notices.

¶11. First we note that Miss. Code Ann. § 85-7-181 is the product of statutory enactment dating to 1880 and is therefore open to statutory construction:

This particular statute was first passed in 1880. However, Mississippi had a mechanics' lien act as early as 1838. The lien under Sec. 372 is purely a creature of statute and did not exist at common law. In its absence materialmen and laborers would be only general creditors of the contractor. Although the statute should be construed liberally to effectuate its purposes, laborers and materialmen have no lien on the money owed by the owner to the contractor until they give the statutory stop notice to the owner. Two systems of liens have been adopted by statutes in various states for the protection of materialmen and laborers. One is known as the Pennsylvania system. It confers a direct and independent lien, irrespective of the rights of the principal contractor. The other system, called the New York system, which is that created by Section 372, confers a lien by subrogation to the rights of the independent contractor. The materialmen or laborers under such a statute are entitled to a lien only when the contractor is entitled to one, and there is something due or to become due to the principal contractor from the owner.

*Chancellor v. Melvin*, 211 Miss. 590, 599, 52 So. 2d 360, 364-65 (1951) (citations omitted).

¶12. While the current statutory construction is open to differing interpretations, we do have at our disposal another rule of statutory construction which may be used by this Court in our efforts to ascertain the intent of the legislature and the meaning of the statute before us today. When the necessity for construction arises:

It is generally regarded as permissible to consider the consequences of a proposed interpretation of a statute, where the act is ambiguous in terms and fairly susceptible of two constructions. Under such circumstances, it is presumed that undesirable consequences were not intended; to the contrary, it is presumed that the statute was intended to have the most beneficial operation that the language permits. It is accordingly a reasonable and safe rule of construction to resolve any ambiguity in a statute in favor of a beneficial operation of the law, and a construction of which the statute is fairly susceptible is favored, which will avoid all objectionable, mischievous, indefensible, wrongful, evil, and injurious consequences.

73 AM JUR. § 258 page 427-28 (1974); *See Dawson v. Townsend & Sons, Inc.*, 735 So. 2d 1131 (¶37) (Miss. Ct. App. 1999) (holding that when a statute is ambiguous and subject to multiple interpretations, courts need to understand the possible effects in order not to interpret the statute in such a way as to cause absurd results); *Chandler v. City of Jackson Civil Service Comm'n*, 687 So. 2d 142, 144-45 (Miss. 1997) (holding that when construing a statute, all possible repercussions and consequences of construction should be considered); *Evans v. Boyle Flying Serv., Inc.*, 680 So. 2d 821, 825-26 (Miss. 1996) (holding that in construing statutes, unthought of results must be avoided if possible, especially if injustice follows, and unwise purpose will not be imputed to legislature when reasonable construction is possible); *Allred v. Webb*, 641 So. 2d 1218, 1222 (Miss. 1994) (holding that when no valid reason exists for one of two possible constructions of statute, interpretation with no valid reason ought not be adopted); *McCaffrey's Food Mkt., Inc. v. Mississippi Milk Comm'n*, 227 So. 2d 459, 465 (Miss. 1969) (holding that the statutory construction which is most beneficial and which will avoid objectionable consequences will be adopted).

¶13. We quickly note that under Bromanco's argument and submitted interpretation, owners who have hired a general contractor to ensure the actual construction of the project would suddenly have themselves vaulted into the shoes of the general contractor regardless of whether they have the expertise to complete the project once a single stop payment notice is received. This would circumvent the precise reason that general contractors are hired. Owners would be left with the arduous task of obtaining information on the current work performed, the supplies and materials provided and those current amounts due to the various subcontractors, materialmen and suppliers.

¶14. In addressing the nature of the relationship between a Amerihost and Bromanco, the trial court held that Amerihost negligently or wilfully failed to follow the funds into the project and that such failure proximately caused the losses claimed by the subcontractors and materialmen. The trial court concluded that Amerihost, as both owner and lender, was liable for all unpaid subcontractor's claims, even if such subcontractor's claims exceeded the contract amount due to its failure to properly monitor the progress of the work and payments to Bromanco as applied under the holding reached in *First National Bank of Greenville v. Virden*, 208 Miss. 679, 45 So. 2d 268 (1950). *Virden* is, however, distinguishable from the case before us today. The *Virden* case was decided on the context of mortgage law when an issue of preference arises between competing liens: a deed of trust on the project held by a bank or mortgagee on advances made under a previously executed mortgage and a mechanic's or materialmen's lien on materials and labor supplied on the project. *Virden*, 208 Miss. at 685, 45 So. 2d at 270. In *Virden*, the supreme court held that where a bank accepts a deed of trust on property from the contractor and advances proceeds to the contractor for housing lots and materials to be used in the construction of houses, but failed to see that the funds were actually going into the housing construction and merely remitted loan proceeds as the contractor requested them, then the bank's lien was only superior to liens of materialmen to the extend that the loan proceeds actually went into the project. *Id*.

¶15. However, in the case *sub judice* we are faced with deciding an issue not from a mortgage standpoint and the resulting priorities of liens between a mortgagee and a materialman, as the Amerihost project was privately funded, but rather from that of mechanics' lien law as was addressed in *Engle Accoustic & Tile, Inc. v. Grenfell*, 223 So. 2d 613 (Miss. 1969). While *Engle* may not fall squarely on all fours, it does however have sufficient analysis to afford us the appropriate avenue to aid us in our decision. In *Engle*, suit was brought by several subcontractors against the project's owners and architect for balances due them as

a result of the prime contractor's default. The owners, Dr.s Melvin, Marland, and Grenfell, entered into a contract with Fran Builders, a partnership composed of Guy Lowe, Jr. and Hudson Turner, the prime contractor, on November 23, 1965 for the construction of a multistory office building in Jackson, Mississippi. The construction contract was on a cost plus fixed percentage basis without a performance bond. Various subcontractors and materialmen were employed by Fran to work on the project and supply building materials. As the project progressed, Fran made nine applications for payment for labor and materials furnished. Each application was submitted to the owner's architect for verification before payment was remitted. In late August 1966, it became apparent that Fran had not paid all laborers and materialmen involved in the project and work ceased shortly thereafter. Fran was later declared bankrupt. None of the laborers or materialmen filed a stop payment notice on their claims until after the owners had paid Fran in full under its ninth and last application for payment.

¶16. The Mississippi Supreme Court, in reaching a favorable decision for the owners, acknowledged the difficult consequences resulting from its decision: "[I]t is regrettably true that either the appellants will lose their labor and materials in the amounts stated or the Owners will be forced to make a double payment. It does not necessarily follow, however, that the Owners were in the best position to have prevented the loss." *Engle*, 223 So. 2d at 618. As was the case in Amerihost, the owners in *Engle*, initiated the overall project and trusted and relied heavily upon their prime contractor to complete the contracted project without any difficulties or problems. The *Engle* court further acknowledged that the subcontractors and materialmen also relied on and trusted Fran, but their reliance and trust were as equally misguided and displaced as were that of the owners. However, in ultimately deciding which party, the owners or the laborers and materialmen, were in the best position to prevent the resulting losses, the Mississippi Supreme Court held that none of the subcontractors or materialmen had availed themselves of a specific remedy afforded them by statute, specifically Miss. Code 1942 Ann. § 372 (1956). *Id*. The court went on to hold that so long as advance payments to the prime contractor by the owners, whether "intentional or unintentional," extinguish debt and are paid prior to receipt of the statutory stop payment notices, liability is precluded on the part of the owners. *Id*. at 619.

¶17. As was the basis for the supreme court's holding in *Engle*, subcontractors and materialmen are not left without recourse under the current statutory construction of § 85-7-181 provided they invoke its benefits and protections though their own due diligence in accordance with the statutory requirements. Those who failed to avail themselves of its benefits now seek to circumvent the statutory requirements and ride the coat-tails of those subcontractors and materialmen who actually asserted their rights. To allow such a result would offend justice. See *Riley Bldg. Supplies, Inc. v. First Citizens Nat. Bank*, 510 So. 2d 506, 508-09 (Miss. 1987) (holding that law governing materialmen's liens is product of enactments of legislature and materialmen hold liens against property only to extent that they have brought themselves within terms of statute); *Frierson Bldg. Supply Co. v. Homestead Sav. & Loan Ass'n.*, 193 So. 2d 421, 423-24 (Miss. 1966) (holding in action to recover for building materials furnished to vendor-builder, it was incumbent upon vendor's materialman to comply with lien statutes, and injustice would arise to simply allow enforcement of lien against innocent purchasers for value who secured loan on property without actual notice of claim which materialman failed to place on record); *Jones Supply Co. v. Ishee*, 249 Miss. 515, 521-22, 163 So. 2d 470, 472-73 (1964) (holding that statutory prerequisites must be strictly complied with to gain statutory benefits and that upon failure to take proper action required by statute as condition precedent to benefits of statute, their remedies are those of common creditors). With this in mind we hold that it would be destructive of the overall purpose of the construction of § 85-7-181 to hold, as the trial

court did, that the legislature intended for one notice to serve as right of lien by all potential subcontractors and materialmen who have labored and provided supplies but have not followed the requirements of the same. Accordingly, we reverse and render the decision.

## II.

## WHETHER THE TRIAL COURT ERRED IN AWARDING PRE AND POST-JUDGMENT INTEREST OF FUNDS INTERPLED AND ON DEPOSIT WITH THE COURT CLERK.

¶18. In view of our disposition of the previous issue, the present issue of whether the trial court erred in awarding pre and post-judgment interest on the interpled funds is for naught and now moot.

## III.

## WHETHER THE TRIAL COURT ERRED IN ITS AWARD ATTORNEYS' FEES.

¶19. Amerihost argues that the trial court erred in awarding attorneys' fees to the appellees when, in fact, Amerihost is entitled to an award of attorneys' fees and costs by virtue of its asserted mere-disinterested stake holder status. The trial court's ruling entailed an award of attorneys' fees grounded in law under Miss. Code Ann. § 85-7-181 to "[t]he laborers, subcontractors and persons who furnished materials and established liens," and a denial of an award of attorneys' fees to Amerihost, whom the trial court concluded had "actively opposed the claims presented" and therefore was not a mere-disinterested stake holder. However, both findings, the award of attorneys' fees to the laborers, subcontractors and materialmen and the denial of attorneys' fees to Amerihost, were grounded in erroneous interpretations of § 85-7-181 and therefore is of no substance in this issue. We note, however, that Amerihost's position opposing those claims presented after its May 15, 1995 payment of $272,819.13 to Bromanco was a defensive stance against the claims of those subcontractors and materialmen who sought to avail themselves of the protections of § 85-7-181 by virtue of the single stop notice sent by Wright's Painting Company on April 17, 1995. We held this interpretation to be incorrect.

¶20. An award of attorneys' fees and costs in favor of the party representing interpleader action against the funds interpleaded into the court registry is a discretionary matter lying with the trial court. *See Hartford Acc. & Indem. Co. v. Natchez Inv. Co.*, 161 Miss. 198, 132 So. 535, 539 (1931). The court may not, however, allow attorneys' fees to materialmen and subcontractors for attorneys representing their separate interests. *Id.*; *But see, e.g.* Miss. Code Ann. § 85-7-181 (1972) (statutory provision allowing an award of attorneys' fees to prevailing laborers and materialmen who have initiated suit as a result of an owner's denial of indebtedness). Amerihost argues that it not only instituted the interpleader action, but also interpled into the court registry sufficient amounts to cover those properly exercised claims which were timely submitted under the requirements of § 85-7-181. *See Maryland Casualty Company v. Sauter*, 377 F. Supp. 68, 70 (N.D. Miss. 1974) (holding that a party who has properly brought an interpleader action may be entitled to an award of attorneys' fees); *Perkins State Bank v. Connolly*, 632 F. 2d 1306, 1311 (5th Cir. 1980) (holding that party who initiates an interpleader action and qualifies as a mere disinterested stake holder may be awarded reasonable attorneys' fees); *Cogan v. U.S.*, 659 F. Supp. 353, 354 (S.D. Miss. 1987) (holding that a mere disinterested stake holder who properly brings an interpleader action may be awarded reasonable attorneys' fees).

¶21. Whether the facts and circumstances surrounding this issue justifies a determination that Amerihost is a

mere disinterested stake holder warranting an award of attorneys' fees is a factual finding as yet undecided under a proper interpretation of law that is consistent with this opinion. An award of attorneys' fees would be contingent upon that finding. Therefore, we remand this issue to the lower court for a factual finding as to whether Amerihost's role in the interpleader proceedings arises to that of a mere disinterested stake holder.

## IV.

### WHETHER THE TRIAL COURT ERRED IN FINDING THAT BRUCE COPES ELECTRIC, INC. WAS NOT ENTITLED TO ANY OF THE FUNDS INTERPLED.

¶22. Bruce Copes Electric, Inc. argues that the lower court erred in finding that Copes was not entitled to any of the funds interpled by Amerihost Development, Inc. The lower court concluded that Copes had not proven that it was entitled to any of the interpled funds by virtue of the lack of credible evidence presented by Copes to support a claim against the interpled funds. The lower court held that the credible evidence established that Copes defaulted on its subcontract with Bromanco and failed to complete the project. The lower court further concluded that while Bromanco hired employees of Copes to complete the project, no change orders were executed by anyone authorizing the work Copes asserts was performed nor was any of the work included in the stop notice.

¶23. Having made a detailed review of the record concerning Copes's claim, we hold that the lower court had before it substantial evidence from which to deny Copes's claim and said ruling was not against the overwhelming weight of the credible evidence. This assignment of error is without merit.

## CONCLUSION

¶24. We reverse and render on the assignment of error raised in Issue I. It was error to hold that the notice of claim by one subcontractor inures to the benefits of those subcontractors and materialmen who had not complied with the notice requirements of § 85-7-181 and provided notice unaided by the diligence of others. Consequently, the additional $272,813.83 ordered deposited into the registry of the circuit court for the $272,813.83 remitted on May 15, 1995 to Bromanco and prior to any additional stop payment notices was error. We reverse and render on the assignment of error raised in Issue II regarding an award of pre and post-judgment interest. We reverse and remand on the assignment raised in Issue III for additional findings on the issue of whether Amerihost meets the requirements of a mere disinterested stake holder. The only fund from which the claimants may lay claim, is the $90,485.59 originally interpled into the registry of the court by Amerihost on November 15, 1995. With respect to the claim asserted by Southern Electric Supply Co., we affirm the trial court's conclusion of law contained in part E of its findings of fact and conclusions of law entered on February 13, 1998. Additionally, given the findings and conclusions reached in part E with respect to Southern's status as a supplier of the general contractor by virtue of the Joint Payment Agreement of February 8, 1995, we hold that the letter sent by Southern Electric Supply Co. on May 4, 1995 to Amerihost qualifies as a stop payment notice affording them the benefits of § 85-7-181 but limited to claims on materials supplied after February 8, 1995. We affirm the trial court's findings with respect to Copes Electric and its decision denying Copes Electric their asserted claim.

¶25. **THE JUDGMENT OF THE WARREN COUNTY CIRCUIT COURT IS REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART AND AFFIRMED IN PART FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS ARE ASSESSED EQUALLY AMONG THE PARTIES.**

**McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, AND PAYNE, JJ., CONCUR. LEE AND MOORE, JJ., NOT PARTICIPATING.**

SOUTHWICK, P.J., DISSENTING TO DENIAL OF MOTION FOR REHEARING

¶26. We have responded to a previously unanswered question about the statute on stop notices. Miss. Code Ann. § 85-7-181 (Rev. 1999). The Court's view is that after receiving a stop notice, the owner of property on which construction is occurring only has to withhold sufficient proceeds to pay that claim and may release all other funds to the contractor. After further review on rehearing, I find that another interpretation of the statute is closer to its actual language. I would grant rehearing.

¶27. My brief answer is that the statute is explicit as to what happens if there is a suit -- all possible claimants to the funds are to be given notice. The statute is silent on the procedure for settling short of litigation. The majority concludes that the silence is a gap that permits the actions taken in this case. I take the silence to be a bar that prevents any procedures that are not the equivalent of what is in the statute. If the procedures set out in the statute are not to be followed, the owner cannot create his own short-form procedures that provide fewer protections. The notice that is given to all when there is litigation must be replicated if there is no suit. The owner should determine who is unpaid and not just satisfy the stop notices and give the contractor the rest.

¶28. I now look at the details of this conclusion.

¶29. Once receiving a stop notice, should the owner who has funds owing to the contractor make no more payments until learning who else may have payment problems? Alternatively, is the owner's duty limited to the total amount of the stop notices actually received? The statute is interminable in length, labyrinthine in style, and old. Why in the year 2000 we are trying to answer a question that should have been disposed of fifty years ago is baffling, but it may be that subcontractors generally avoid stop-notices for a variety of business as well as legal reasons.

¶30. The trial court found that several subcontractors who did not themselves file stop notices should receive the benefit of two other subcontractors' stop-notices. The majority mentions that the subcontractors make a detailed analysis of the statutory history. We do not review that analysis because we reject their interpretation on a more fundamental level. That level is that "where the Act is ambiguous in terms and fairly susceptible of two constructions. . . it is presumed that undesirable consequences were not intended; to the contrary, it is presumed that the statute was intended to have the most beneficial operation that the language permits." We find that the subcontractors' arguments would lead to absurd results and cite well-reasoned authority on the need to avoid that.

¶31. However, after considering the statute and reviewing its history, I find that the reading that we give to it also leads to unfortunate results. We said in our original opinion that to allow one stop notice to protect everyone creates this problem: "owners who have hired a general contractor to ensure the actual construction of the project would suddenly have themselves vaulted into the shoes of the general contractor regardless of whether they have the expertise to complete the project once a single stop payment notice is received. This would circumvent the precise reason that general contractors are hired. Owners would be left with the arduous task of obtaining information on the current work performed, the supplies and materials provided and those current amounts due to the various subcontractors, materialmen and suppliers."

¶32. Basically the idea is that if a supplier of a $1.50 light bulb is not paid and files a stop notice, it is absurd that no more money could be paid by the owner to the contractor until all subcontractors are contacted by the owner to see if they too are having problems. Agreed, but only because it is an extreme. If we focus on extremes, we will miss the more general operation of the statute.

¶33. A more realistic example of the operation of the statute comes from the facts of our case. Two subcontractors about 18 days apart filed stop notices totaling $55,000. Ten days later the owner paid the remaining money it owed to the contractor. The statute does not require service of the stop notice on other subcontractors, so they do not necessarily know of other payment problems. Notice of a claim may be filed in the lis pendens book, so perhaps subcontractors can daily or weekly monitor those. Miss. Code Ann. § 85-7-197. Still, others who may soon learn they should file a stop notice may not yet have suffered payment problems, because they are on a different payment schedule. Their problems may arise weeks after a different subcontractor has reached critical stage with the contractor. So nothing in the filing of one stop notice necessarily is causing others to do the same.

¶34. What if instead of two stop notices, there had been five, or ten, all within the 18 day period? We would still be holding that even though evidence of a serious problem exists, the owner can pay the contractor so long as enough is held out for the stop-notices. I suggest that a not-overly-absurd result would be that a stop notice signals that some degree of problem exists with subcontractor payments. The majority insists that the owner not be vaulted into the role of the contractor by requiring the owner to ascertain whether other subcontractors are not being paid. The statute provides the means to avoid that situation by permitting the funds to be interpleaded with notice to all possible claimants. The majority in this Court agrees with the owner Amerihost that the problem is also avoided by payment solely to the complaining individuals if that is done prior to litigation.

¶35. I will later explain my basis for concluding that Amerihost's position is in error. What the foregoing proves at least for now is that the answer to our statutory interpretation issue is not reached by categorizing the subcontractors' position as absurd and the owner's as sweet reason. Significant inequities and hardship can arise under imaginable scenarios no matter which party's position is accepted. I think our task starts and largely ends with discerning the interpretation that is the more faithful reading of the language used in the statute.

¶36. The entire statute is quoted in the majority opinion. Its first independent clause (the first 436 words form one sentence), greatly redacted, is this:

> When a contractor . . . shall not pay any person who may have furnished materials used in the erection . . . of any . . . building, . . . any such person . . . may give notice in writing to the owner thereof of the amount due him and claim the benefit of this section.

Miss. Code Ann. § 85-7-181. This is fairly straightforward and is not the problem. We have two such "persons" who gave notice in writing of the amount due them.

¶37. The next independent clause starts the confusion:

> thereupon the amount that may be due upon the service of such notice by such owner to the contractor . . . shall be bound in the hands of such owner for the payment in full, or if insufficient then pro rata, of all sums due such person . . . who might lawfully have given notice in writing to the owner

hereunder.

*Id.* The literal reading of this clause is that the amount due by the owner to the contractor -- not the amount of the claim -- shall be "bound" for the payment of all who "might lawfully have given notice." Does that mean the same thing as "could lawfully have given" notice, or does it mean those who actually gave notice? The persons who may lawfully give stop notices are subcontractors who are owed money by the contractor, i.e, those to whom the contractor is in default. "Might" is the past tense of "may." One definition of "might" is "to express possibility or probability or permission in the past." Am. Her. Dict. Eng. Lang. 1143 (3d ed. 1992). To put the phrase in the present tense, it would be those who "may lawfully give notice." It is probably dangerous for us in the last year of the twentieth century to get overly focused on use of a word early in the same century. Even if our tenth grade English teachers "might" be convinced that there is one correct way to read this sentence, that may not be what the legislature in context should be said to have meant.

¶38. What is clear as a matter of literalism at least is that it is the entire amount in the hands of the owner that is bound -- "the amount that may be due upon the service of such notice by such owner to the contractor . . .shall be bound."

¶39. Going to the next clause, it states this:

> if after such notice, the contractor . . . shall bring suit against the owner, the latter may pay into court the amount due on the contract; and thereupon all persons entitled hereunder, so far as is known, shall be made parties and summoned into court . . ..

*Id.* What is a fair reading of this section is that all subcontractors are given notice of the suit, not just those who have given stop notices. The statute goes on to say that the court will direct the payment to the persons entitled. The next section of the statute permits a subcontractor to bring a suit, and that person is to give notice to all other subcontractors. The owner may interplead everything that it has and let the workers fight it out. Alternatively, the owner may dispute individual claims and actively participate in the court's resolution. The important point for our issue is that all potential claimants are to be given notice no matter who initiates the litigation.

¶40. So among the matters that are relatively clear is that if a suit is filed, all subcontractors are summoned and not just those who have filed stop notices. Thus under our interpretation the silence in the statute regarding handling of stop notices without suit permits procedures that are inconsistent with those that apply when there is a suit. We have said when no suit is filed, the stop notice by itself is the extent of the owner's concern; when suit is filed, all subcontractors must be given notice.

¶41. Inconsistency does not prove the majority is in error; a statute may provide different protections at different stages in the process. To be precise, though, the statute *provides* no rules for what was done in this case. Acknowledging the inconsistency sets the stage for divining the interpretation that is closest to the statutory language, read in the context of the statutory purpose. Seeking the purpose of legislation should not lead a court away from the words of legislation, but the inquiry can provide a basis for resolving ambiguity. To determine purpose, we should accept the subcontractors' invitation to examine the significant amendments that were made to the statute in 1918 that adopted most of the confusing language. These amendments were almost certainly responding to a 1917 supreme court decision. *Enochs Lumber v. Garber,* 116 Miss. 229, 76 So. 730 (1917). The pre-1918 statute gave priority to sub-contractors based

on the date of the filing of their notices. Subcontractors did not share pro rata in the amount in the hands of the owner. If the total of the claims of the first two subcontractors to file stop notices consumed all the money then in the owner's hands, and five other subcontractors filed days or even minutes afterwards, those last five received nothing. *Id.*, 116 Miss. at 232.

¶42. The purpose of the 1918 amendments was explained in a case that is argued at great length in Bromanco's original and rehearing briefs. *McNair v. M.L. Virden*, 193 Miss. 232, 4 So. 2d 684 (1941). The *Virden* briefs summarized in the *Mississippi Reports* version show how much the issue of the 1917 *Enochs* case was before the court. What ultimately *Virden* decided is expressed in the last three pages of the opinion. *Id.,* 193 Miss. at 247-49. It agrees with much of the argument of the subcontractor here, namely, that the old law focused on the person who gave the notice and the new law on all "in the same class." The court said the "very purpose" of the new law

"was to confer equal rights on all persons in the same class, regardless when, *or whether*, such persons had given the owner written notice, *provided the owner yet had in his hands funds owing to the contractor when such claimants gave notice, or if notice was not given, the claim or claims were asserted in court.* In other words, one notice stops the right of the owner to pay the contractor the amount claimed in that notice. [Bromanco calls that last sentence *dicta*.]

"If other claimants in the same class subsequently give notice to the owner of their claims, or if they do not give the notice, but assert their claims in court, to which the owner is a party, all before the owner has paid out the funds which he had when the first notice was received, then all such persons share ratably in those funds."

*Id.,* 193 Miss. at 248 (emphasis added). The subcontractor dislikes this entire last paragraph. I agree that much of this was *dicta*, but it cannot be disregarded solely for that reason.

¶43. The court then waxes eloquently on the general subject, and states that it is the furnishing of materials that is important, "not the giving of notice." *Id.* at 249. The court is rejecting the old law's first-in-time rule, though, and we should not put too much weight on that phrase. The court says that if this is not what the new law means, they cannot figure out why the amendments were made.

¶44. The court stated that this was not "a case where the owner pays the balance to the one giving the notice before he receives such notice from others, or before others assert their claims in court. . . . We will deal with that when and if such situation arises" *Id.* at 244. They may not have expected that it would be a Court of Appeals sixty years later that finally got to the issue. Nonetheless, we should not ignore that *Virden* specifically avoided deciding whether an owner's payment of all current stop notices and release of the remainder to the contractor satisfied the statutory process.

¶45. Thus, if one person gives the notice, the rights of the others who may not get paid do not depend *solely* on their filing notice. The holding explicitly only protects them if they alert the owner at least by a suit prior to when the money is disbursed that there are others who have a claim. The sole stop notice in *Virden* was for an amount larger than what the owner still retained; therefore the only funds subject to one or ten stop notices remained in the owner's hands.

¶46. The 1918 statutory change was focusing on the equity of providing "ratable" payments. So long as the owner still has funds in his hands at the time he becomes aware of the claims of the other subcontractors,

whether by later stop notices or by suit, then those others get paid ratably and not in order until the fund is exhausted.

¶47. Since the amendments were directed at ending the full-payment in order of notice approach, it makes sense that it would not matter whether a notice was sent at all by someone in the same "class" as a claimant who had sent notice. I do not know what the court means by "class." It could be that the court was thinking in terms of subcontractors being one class, materialmen another, laborers another. I do not see how the statute can be read to differentiate the effect of a stop notice by category of persons entitled to give them, i.e., if a "journeyman" gives notice, then all other journeymen are protected but not subcontractors. No language makes that distinction. Regardless, that issue is not explored by the parties here.

¶48. Our case presents the issue that is unaddressed in the statute of the procedure that the owner must follow for resolving stop notice claims without litigation. The 1918 amendments were intended to prevent the order of the filing of the stop notices from controlling. So the amendments contemplate that stop notices are filed at different times, some later than others. The filing of the first stop notice is not like the filing of a civil complaint against multiple defendants, in which a schedule is by rule created for when the other parties have to respond. No definite time limits control what the owner does with the first notice or when others claimants file notices.

¶49. Does the owner after receiving a stop notice at 3:00 P.M. for less than the money then in his hands due to the contractor, have the right to pay that stop notice at 4:00 P.M. and give the remainder of the money to the contractor before day's end? What if another stop notice is filed at 8:00 A.M. the next day? The subcontractor who filed on the second day has made a prompt filing. Immediate payment to the contractor, reserving only the amount of the one stop notice, would undercut the protections that *Virden* states the statute is providing. Perhaps this is objectionable only if the immediate payment was unusual for the owner, but commercial reasonableness is not the linchpin of the statute. Notice is. Whose notice remains our issue.

¶50. We should also examine whether non-judicial writings on the subject have adopted any particular view. Two companion articles on the general legal area have appeared. One is not especially on point, though it identified the first stop notice statute as having been adopted in 1857. James M. Brown, *Mechanics' Liens: An Interpretation of Section 356 as Amended,* XXXVII Miss. L. J. 203, 208 (1966). The more useful article is a supplement to the first. James M. Brown, *Mechanics' Liens: Mississippi Notice Requirements*, XXXVII Miss. L. J. 385 (1966).

> Its [the stop notice's] net effect was to prevent the owner, after he had received the notice, from making further disbursements under the contract until the subcontractor claims were paid in full or pro-rata out of remaining contract funds. Serving this notice often had the effect of abruptly halting construction pending accumulation, analysis, and negotiation of all potential claims arising therefrom. As a remedy designed to make available the maximum fund statutorily possible, it was very effective.

*Id* at 387 (footnotes omitted). Professor Brown assumed that a stop notice froze all the funds and "accumulation" and analysis of all claims would then have to be performed. The article further discusses the statute but never draws a distinction between filing suit and the right of the owner to resolve the claim without litigation.

¶51. Somewhat relying on Brown's article but not totally agreeing with him were two writers of a law student comment. William L. Smith and Boswell Stevens Hazard, Comment, *Mississippi Law Governing*

*Private Construction Contracts: Some Problems and Proposals*, 47 Miss. L. J. 437 (1976). They too are concerned with the absurd result of one small claim's freezing all the money, but still found that result to be a reasonable reading of the statute. *Id.* at 453-54. Unlike Professor Brown, students Smith and Hazard referenced the limitation of the 1941 *Virden* decision, namely that it did not address the effect of an owner's paying off the stop notice before receiving other subcontractors' claims. *Id.* at 453 n. 79. Still, in their view disbursement to the contractor after retaining enough to pay off the stop notice satisfies the statute. *Id.* at 454.

¶52. I find these to be reasonable reviews of the law as it had been announced so far, recognizing that some questions had not yet been answered. What they could not describe but we must, is the situation in which "the owner pays the balance to the one giving the notice before he receives such notice from others, or before others assert their claims in court." *Virden,* 193 Miss. at 244.

¶53. In my view the question that requires answering arises from silence in the statute. The statute states that once a stop notice is given, the amount that the owner owes the contractor is frozen "for the payment in full, or if insufficient then pro rata, of all sums due such person, subcontractor, journeyman or laborer who might lawfully have given notice in writing to the owner." Miss. Code Ann. § 85-7-181. The very next section of the statute discusses a suit brought by the subcontractor to resolve the dispute, which is then followed by an owner's right to file suit and interplead the funds. In both situations, notice is to be given "all persons entitled hereunder, so far as known. . . ." *Id.*

¶54. The *procedure* for an owner to resolve the claims without a suit just is not addressed in the statute. The statute certainly does not say that the owner can just set aside enough for the known claims and pay the rest to the contractor.

¶55. Absent any stated procedure in the statute, and based on the *Virden* interpretation that the relevant language was intended to remove priority based on filing or even the need of filing by subsequent claimants in order to get stop notice protection, I find that there is a duty on the owner to make inquiries about the extent of claims. It is the equivalent of giving notice to everyone in litigation. The answer that we gave -- only claims covered by stop notices have to be satisfied -- makes the owner's unilateral decision on whether to interplead or instead to pay without litigation incredibly significant on the protections that the statute gives. Since the owner does not even have the express statutory right to settle without suit, he should at least be required to duplicate the notice protections of a suit. Whether a new stop notice comes in a day or a week after the first one, our interpretation permits the owner to pay immediately after the first stop notice. That "protection" for subcontractors is inconsistent with the statute.

¶56. In conclusion, I do not find that the implications of the trial court's decision are any more disruptive to construction projects than is compelled by the language of the statute. If there is a stop notice, the statute explicitly provides that all funds are frozen and litigation may be commenced that will prevent any payments from being made. That is disruptive. All I find that the trial court added is that even if no suit is filed, the same protection applies to subcontractors who *might* have filed stop notices. The owner cannot pay some without discerning the overall situation.

¶57. The statute is ungainly and in some respects impractical. The legislature usefully could give serious attention to creating a more modern and less disruptive system. What exists creates problems. Still, it is not for this court to announce an improvement which, on balance, this may not even be.

**BRIDGES AND PAYNE, JJ., JOIN THIS SEPARATE OPINION.**