**UNITED ELECTRIC CORPORATION,**
Appellant,

v.

**ALL SERVICE ELECTRIC, INC., et
al., Defendants,**

**George W. Olsen Construction Co.,
Inc., Respondent.**

No. 46886.

Supreme Court of Minnesota.

July 1, 1977.

Culhane & Culhane, Michael L. Culhane, and James E. Culhane, Minneapolis, for appellant.

Eckberg, Lammers, Briggs & Wolff, and James F. Lammers, Stillwater, for respondent.

Heard before ROGOSHESKE, PETER-SON, and SCOTT, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from a judgment of the District Court of Washington County. United Electric Corporation (United) commenced the action in 1974 against numerous defendants including George W. Olsen Construction Company (Olsen) and All Service Electric Company (All Service). After dismissals and voluntary payments by some defendants, the case was tried to the court in November 1975 with only Olsen and All Service as defendants.[1] Following the trial, judgment was entered in favor of Olsen, and United appealed upon denial of its post-trial motion for a new trial.

This case involves the construction of an addition to the Carnegie Public Library in Stillwater, Minnesota. Funds for the project were provided by the Margaret Rivers Foundation (Rivers), a charitable corporation. The general contractor was Olsen, under contract with Rivers. Olsen entered into a subcontract with All Service, whereby All Service agreed to furnish all of the labor and materials for the electrical portion of the contract as per specifications.

All Service intended to purchase electrical materials for the job from United, but United would not make such sales to All Service on open credit because of the latter's poor credit standing. Olsen was aware of this difficulty and consented to a joint check arrangement.[2] Olsen agreed to issue checks to All Service and United as copayees in order to insure payment to United for materials.[3] Five items of correspondence outline the details of the joint check arrangement. The first in chronological order is a letter from John Kostka, president of All Service, to Dan Corcoran, vice president of Olsen:

"December 7, 1971

"Dear Sir:

"As per previous phone conversation you indicated there would be no problem in making checks payable jointly to ourselves and United Electric in payment for work performed on the Carnegie Library job.

"Therefore, I hereby give you authorization to issue checks in the above manner."

Next is a letter from M. Steiner, credit manager of United, to Corcoran:

"December 8, 1971

"Dear Sir:

"As I mentioned to you on the phone the other day, we are supplying material to All Service Electric, White Bear, Minnesota, for use on the Stillwater Library Job. We have agreed to supply material on the condition that all checks prepared by you on the basis of invoices submitted by All Service Electric be made payable to both All Service Electric and United Electric Corporation of St. Paul. Both you and John R. Kostka have indicated verbally that this arrangement would be agreeable to all concerned.

"We would appreciate hearing from you by letter that All Service Electric has authorized you to prepare the checks as indicated above, and that you have agreed to this arrangement. Thank you very much for your co-operation."

Corcoran responded to Kostka, after receiving Steiner's letter, as follows:

"December 10, 1971

"Dear Sir:

"Enclosed please find a copy of a letter from United Electric Corp., in regard to making dual payments to yourself and United Electric Corp., for materials which you will be purchasing from them for the above named job.

1. All Service is out of business and failed to appear at trial. Judgment was rendered against it by default.

2. Because the property involved was municipal, lien rights were not available to any of the contracting parties. Further, Olsen had posted only a performance bond with Rivers, not a payment bond.

3. Under Minn. St. 336.3–116(b), instruments payable to joint (not alternate) payees are negotiable only by endorsement of both.

"We would appreciate it if you would please advise us in writing that you agree with the enclosed letter."

Corcoran then wrote to Steiner several weeks later:

"December 21, 1971

"Dear Sir:

"This will verify our telephone conversation of Friday, Dec. 17, 1971. As per that conversation we will make checks payable to both yourself and All Service Electric for materials furnished by your Company for the above named job. It will however be necessary for either you or All Service Electric to furnish us with a copy of your invoice so that these joint payments may be made."

The final item was a note from Steiner of United to Kostka of All Service:

"December 22, 1971

"John, Just a brief note before I leave on my well earned vacation. You received a copy of the letter Geo. Olsen Construction Co. wrote to me. Now I need a letter from you agreeing to the provision which states they need a copy of our invoices to you. Also, please stipulate in your letter if you want to furnish them with the copy, or if you want us to send them a copy."

Steiner's testimony at trial was to the effect that All Service did not respond in writing to his last note, but that he did discuss the matter by telephone with All Service; that All Service did not give authorization to United to submit its invoices directly to Olsen; that it was against United's company policy to supply invoices to the general contractor absent the approval of the customer; and that he did not inform Olsen that All Service had withheld its permission for direct invoicing. Corcoran's testimony was to the effect that he received no subsequent correspondence concerning the joint check arrangement after his December 21 letter to United; that he had no further contact with either United or All

Service about the arrangement; and that during the project he did not request United invoices from either United or All Service, though he knew United was continually supplying materials to the job.

Steiner admitted that he understood the invoicing requirement of Corcoran's December 21 letter. He stated it was his understanding that All Service would supply Olsen with copies of United's invoices, and he confirmed Corcoran's testimony that joint checks were to be issued for materials only, not for labor and materials both.

In 1972 Olsen issued 11 checks under the electrical subcontract, totaling $23,400. Of these, seven were made out to All Service and United as copayees, totaling $11,966.57, while the remaining four were issued only to All Service.[4] Following All Service's default on the contract, Olsen paid out an additional $2,892 to other electrical subcontractors to complete the job. The remaining $1,457.05 of the original adjusted contract price of $27,749.05 was paid into the court by Olsen. It was finally stipulated that United did not receive payment for materials totaling $8,272.66. This is the actual amount in controversy, and is the amount the district court awarded to United against All Service.

The seven joint checks were issued under the following circumstances: The first check, in the amount of $776.12, was issued on January 26, 1972, after Steiner called Corcoran to tell him how much they had shipped to the job in December. Four successive joint checks were issued June 27, July 7, July 27, and August 18, in response to two "statements" supplied to Olsen by United on May 4 and July 6 totaling $3,990.45. The final two joint checks, totaling $7,200, were issued October 20 and November 21, after Olsen had received a letter from United stating that it had billed All Service for a total of $19,069.93, but had received only $3,872.08 in payments via joint check.[5] Steiner agreed that, had

---

4. All Service illegally cashed two of the joint checks totaling $5,520 on its endorsement alone. This money has been paid over by the banks involved to United.

5. All Service had cashed the check of June 27, 1972, for $1,020 without United's knowledge or endorsement.

United actually received all of the first five joint checks, it would have been paid in full as of July 1972. Steiner admitted he had not requested any payments in writing form Olsen during the period July 6 to October 24, 1972. During this period checks were issued to All Service alone totaling $6,809.55. To summarize these various transactions:

(1) Through June of 1972, United was paid by Olsen for all materials supplied.

(2) Between July and October, 1972, United made heavy shipments to the job, but was not paid by All Service or Olsen during this time.

(3) In October Olsen paid United $7,200,[6] which was not nearly enough to bring United's account up to date.

(4) Olsen paid other electrical subcontractors $2,892 of the remaining contract funds from November of 1973 to October of 1974 to complete the project.

(5) Olsen paid the remaining contract balance of $1,457.05 into the court for eventual payment to United.

Olsen completed the job, was paid in full by Rivers, and has been discharged from all obligations under the general contract.

At trial United argued for the position that all checks from Olsen to All Service should have been joint checks, while Olsen contended that the "invoice" condition had not been complied with by United. The key factual findings made by the district court are Nos. XV and XVI:

"XV

"That to the extent Olsen received either invoices or statements from United, and had money owing to All Service, Olsen issued dual checks payable to both All Service and United thereby complying with its said letter of December 21, 1971 to United. To the extent that it has not been paid for materials supplied to the Carnegie Library project, United made its own loss possible by not submitting invoices or statements to Olsen for materials supplied so that dual checks could be issued."

"XVI

"That there was no contractual relationship between Olsen and United either express or implied which would require Olsen to pay for all materials supplied by United to the project. That based on the invoices supplied to Olsen by either All Service or United, Olsen made joint payments for materials supplied by United. That Olsen's obligation to All Service has been fully satisfied and discharged, and Olsen has no obligation to pay any additional amounts to United."

We find the legal issue presented to be: Is United entitled to judgment against Olsen for unpaid materials based upon contractual liability or promissory estoppel?

█ The difficulty with the claim in contract is that United was under no obligation to Olsen to supply the materials, even given the agreement as to joint checks. At most United was contractually obligated to All Service, since it had submitted a bid to All Service. Had United declined to supply materials to the project, even after the joint check arrangement was concluded, it is clear that Olsen could not have sued United for breach of contract. Thus, while Olsen's promise to issue joint checks was not gratuitous, in the sense that it was for the purpose of inducing United's cooperation on the project, United was not mutually obligated to Olsen to perform. In these circumstances the joint-check agreement is not supported by mutuality of obligation and cannot rise to the level of express contract.

█ In this case, however, the doctrine of promissory estoppel applies. This doctrine is defined by Restatement, Contracts (2d), § 90, as follows:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy for breach may be limited as justice requires."

---

**6.** The October 20 joint check for $4,500 was also illegally cashed by All Service.

All of the elements are present here. Olsen promised to issue joint checks for the purpose of inducing United to supply materials for the project. Olsen's promise did in fact induce United to supply the materials. Since United remains unpaid for a substantial amount of the materials it supplied, it will suffer injustice if the promise is not enforced.

The essence of Olsen's promise was to issue joint checks when United supplied materials for the project. It is true that Corcoran had attempted to add a condition to the promise, namely, that Olsen had to receive United's invoices before joint checks would be issued. Steiner admitted he understood this condition. Nevertheless, Olsen had taken upon itself an enforceable obligation to see that United was paid, an obligation it accepted to induce United's supplying of necessary electrical materials. Corcoran's testimony was that he was aware United was continually supplying electrical materials to the job, even though he was not being separately invoiced for these materials.

 The doctrine of promissory estoppel is equitable in nature. Under the facts presented, we find that Olsen is estopped from relying upon the invoice condition to avoid payment to United. Olsen's awareness that United was supplying materials to the project in reliance upon the joint check arrangement prevents Olsen from refusing payment to United now that the project is completed and Olsen has been paid in full by Rivers. While United was not vigilant in protecting its right to payment, Olsen was not justified in accepting United's performance without exercising some vigilance of its own to protect United as it had promised to do. If a loss is to fall on one of two innocent parties, equity dictates that it remain with him who is in the better position to have prevented it. *Hughes v. Monnahan*, 282 Minn. 407, 165 N.W.2d 231 (1969).

Reversed.