932 So.2d 863 (2006)
SERVICE ELECTRIC SUPPLY COMPANY, INC., Appellant,
v.
HAZLEHURST LUMBER COMPANY, INC., Appellee.
No. 2004-CA-02135-COA.
Court of Appeals of Mississippi.
February 28, 2006.
Rehearing Denied June 27, 2006.
*865 Derek Andrew Henderson, attorney for appellant.
Dennis L. Horn, Shirley Payne, Madison, attorneys for appellee.
EN BANC.
CHANDLER, J., for the Court.
¶ 1. Service Electric Supply Company, Inc. sold electrical parts to Magnum Industrial and Controls, Inc. for use in a building project owned by Hazlehurst Lumber Company, Inc. (HLC). Magnum was the general electrical contractor on the project. On October 1, 2002, Service Electric filed suit against HLC for the value of certain materials which Service Electric had delivered to the job site. HLC moved for summary judgment. Service Electric filed a response and a cross-motion for partial summary judgment.
¶ 2. The trial court granted summary judgment in favor of HLC and denied Service Electric's cross-motion for partial summary judgment. Service Electric appeals, arguing (1) that a letter from HLC to Magnum and Service Electric created a contractual relationship between HLC and Service Electric; (2) alternatively, that HLC is estopped from denying its liability to Service Electric; and (3) that the trial court should have granted Service Electric's motion for partial summary judgment *866 and entered a judgment for Service Electric in the amount of $13,787.05.
¶ 3. We find that Service Electric was not entitled to recover payment from HLC for any materials which Service Electric sold to Magnum. Therefore, we affirm the grant of summary judgment to HLC.

FACTS
¶ 4. HLC planned to add updated equipment to its lumber milling operation. On February 11, 1998, HLC contracted with Magnum to perform the electrical work for the project on a cost-plus basis, with the total cost of Magnum's work not to exceed $240,000. HLC agreed to pay Magnum for all materials used in the project at cost plus ten percent. The construction contract was memorialized as HLC's Purchase Order No. 24234.
¶ 5. Shortly thereafter, Ronnie Rogers, the owner of Magnum, informed Starke Albritton, HLC's operations manager, that he wished to purchase electrical supplies for the project from Service Electric. Rogers told Albritton that Larry Stickell, the owner of Service Electric, refused to sell to Magnum unless HLC promised to pay for electrical supplies by joint check payable to Magnum and to Service Electric. In response, Albritton executed the following letter:
February 20, 1998
TO: Terry Stickels [sic] and Ronnie Rogers
Hazlehurst Lumber Company agrees to pay for materials used on our project NO. 699-01 by joint check. The check will be made to Service Electric Supply and Magnum Industrial Power and Controls. This in no way affects the responsibility of Magnum to perform to the bid specifications (Dated 1/20/98) and does not in any way alter the purchase order currently in place.
 Sincerely,
 s/Starke Albritton
 Starke Albritton,
 Operations Manager
 Hazlehurst Lumber Company
¶ 6. Rogers gave a copy of the letter to Stickell. According to Albritton, Stickell called him and asked if HLC was agreeing to pay for any and all materials ordered by Magnum. Albritton said HLC did not agree to pay for any and all materials ordered by Magnum, but only agreed to pay Magnum for parts with joint checks payable to Magnum and to Service Electric. Albritton emphasized that his contract for parts was with Magnum and that the total cost of parts and labor for the project was not to exceed $240,000. Stickell stated that Service Electric never would have sold materials to Magnum without the letter from Albritton agreeing to issue joint checks.
¶ 7. Magnum began ordering parts from Service Electric for use on the HLC project. Service Electric shipped the parts to Magnum at the HLC job site. A statement from Service Electric reveals that Service Electric billed Magnum for the parts. Albritton testified that, as the project progressed, Magnum submitted bills to HLC that included parts accountings from Service Electric. HLC paid several such bills by joint check made payable to Magnum and to Service Electric. The amount of each check reflected Magnum's cost for the parts plus his ten percent profit. Magnum endorsed each check and sent it to Service Electric, which endorsed and cashed the check. Per agreement with Magnum, Service Electric kept Magnum's ten percent profit as payment toward Magnum's debt to Service Electric for parts supplied on a prior construction *867 job.[1]
¶ 8. In April 1998, HLC noticed that Service Electric had overcharged Magnum for certain electrical parts. Magnum contacted Service Electric, which admitted having inadvertently overcharged Magnum. Service Electric issued credit memorandums for the overcharges. At the end of April, HLC instructed Magnum to cease ordering electrical supplies from Service Electric. For the next couple of months, previously ordered parts and their associated invoices continued to arrive from Service Electric.
¶ 9. In June 1998, HLC paid one of Magnum's bills for Service Electric parts with a check made payable to Magnum alone. This check was in the amount of $13,787.05. Albritton admitted that the check was supposed to have been made jointly payable to Magnum and to Service Electric. He averred that HLC's accounting office had inadvertently left Service Electric's name off the check. Magnum cashed the check. Rogers told Stickell that he planned to send the money to Service Electric. Stickell called Albritton and explained the situation. According to Albritton, he told Stickell that HLC would withhold payments from Magnum until Magnum paid the $13,787.05 to Service Electric.[2] In July 1998, Stickell told Albritton that Magnum had paid it, and HLC resumed payments to Magnum. Later, Stickell told Albritton that, in fact, Magnum had given him a bad check and Service Electric remained unpaid. Service Electric never recovered the $13,787.05 from Magnum.
¶ 10. In late spring and summer 1998, Magnum's work on the HLC project slowed and, by fall 1998, had stopped entirely. Several HLC employees observed Magnum employees removing electrical supplies from Magnum's on-site storage trailer. One of Magnum's employees stated that Magnum was transporting the supplies to other construction sites.
¶ 11. Due to Magnum's failure to perform, HLC was forced to hire other electrical contractors to complete the project. HLC stopped paying Magnum at the time it became apparent that Magnum was not going to complete the work. Albritton was uncertain whether its total payments to Magnum had met the contract price of $240,000.
¶ 12. Magnum never paid several of Service Electric's materials invoices. Service Electric sued to recover $33,420.35, the amount of the unpaid invoices, from HLC in contract or quantum meruit. Additionally, Service Electric moved on the ground of estoppel for a partial summary judgment in the amount of $13,787.05, for the check which HLC had made payable to Magnum alone. In its bench opinion granting summary judgment to HLC, the trial court found that Service Electric could not recover in quantum meruit because it had failed to show that it had a reasonable expectation that HLC would pay Service Electric for the materials. Rather, the court found, HLC had a contract with Magnum under which Magnum was to pay materialmen. The court further found that Service Electric was barred from recovering from HLC because it had failed to serve HLC with a stop notice pursuant to Mississippi Code Annotated *868 section 85-7-181 (Rev.1999). Finally, the court found that the February 20 letter was a term ancillary to the HLC-Magnum construction contract which provided for a method of payment. The court found that the letter was not a contract between HLC and Service Electric due to a want of consideration.

STANDARD OF REVIEW
¶ 13. This Court reviews the grant or denial of summary judgment de novo. Stewart v. Hoover, 815 So.2d 1157, 1159(¶ 6) (Miss.2002). The trial court's grant of summary judgment will be affirmed when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). "[T]o determine which factual issues are material, we must first examine the substantive law that governs the case, and to determine if an issue of material fact is genuine, we must then decide whether `the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Murphree v. Fed. Ins. Co., 707 So.2d 523, 529 (Miss.1997) (quoting Bache v. Am. Telephone and Telegraph, 840 F.2d 283, 287 (5th Cir. 1988)). This Court considers all the evidence in the light most favorable to the non-moving party. Hataway v. Nicholls, 893 So.2d 1054, 1057(¶ 9) (Miss.2005).
¶ 14. In the case sub judice, the Court has been asked to review the propriety of the lower court's grant of summary judgment to HLC and its denial of partial summary judgment to Service Electric. On summary judgment, the movant carries the burden of persuading the court that there is no genuine issue of material fact and that he is entitled to a judgment as a matter of law. Hartford Cas. Ins. Co. v. Halliburton Co., 826 So.2d 1206, 1215(¶ 30) (Miss.2001) (citing Fruchter v. Lynch Oil Co., 522 So.2d 195, 198 (Miss.1988)). The party with the burden of proof of a claim or defense at trial carries the burden of production. Id. If the movant has the burden of proof of a claim at trial, then the movant must demonstrate that the non-movant "has no valid . . . defense to the action" and that the movant therefore is entitled to a judgment as a matter of law. M.R.C.P. 56 cmt. To survive summary judgment, the non-moving party then must produce affidavits or other materials showing that a genuine issue of material fact exists to be tried. Hartford Cas. Ins. Co., 826 So.2d at 1215(¶ 31). If the non-moving party bears the burden of proof of a claim or defense at trial, then the moving party must demonstrate that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Id. at (¶ 30). In response, the non-moving party, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Id. at (¶ 31) (quoting MST Inc. v. Miss. Chem. Corp., 610 So.2d 299, 304 (Miss.1992)).

LAW AND ANALYSIS

I. DID THE FEBRUARY 20 LETTER FROM HLC TO MAGNUM AND SERVICE ELECTRIC CREATE A CONTRACTUAL RELATIONSHIP BETWEEN HLC AND SERVICE ELECTRIC?
¶ 15. Pertinent to this appeal are the legal relationships between the parties to a construction contract and the suppliers of materials and labor expended in the building project. At common law, materialmen and laborers who have dealt only with the prime contractor are general creditors of the prime contractor and have no right to recovery from the project owner. *869 Chancellor v. Melvin, 211 Miss. 590, 598, 52 So.2d 360, 364 (1951). Mississippi Code Annotated section 85-7-181 (Rev. 1999) provides that a material supplier or laborer not paid by the prime contractor may serve the project owner with a written notice of the nonpayment, termed a "stop notice." When a material supplier or laborer serves the owner with a stop notice, all funds due from the owner to the prime contractor become bound in the hands of the owner for payment to the party having served the stop notice. Id. A judgment against the owner under section 85-7-181 operates as a lien commencing on the date the stop notice was served. Id. However, the owner's payment in full of all amounts due to the prime contractor prior to the service of a stop notice extinguishes the owner's liability. Engle Acoustic & Tile, Inc. v. Grenfell, 223 So.2d 613, 619 (Miss.1969).
¶ 16. Though it experienced problems securing payment from Magnum, Service Electric never availed itself of the statutory lien by serving HLC with a stop notice. Therefore, Service Electric stood as a general creditor of Magnum and did not have any right to recovery from HLC. Chancellor, 211 Miss. at 598, 52 So.2d at 364. Service Electric admits that it never served HLC with a stop notice and that it did not acquire a lien against any funds which HLC owed Magnum. Service Electric argues that no statutory lien was necessary because it had a direct contractual relationship with HLC that arose from the February 20 letter. Service Electric contends that HLC was contractually bound to pay Service Electric for all materials ordered by Magnum for the HLC project and to pay for said materials by joint check.
¶ 17. An enforceable contract requires an offer, acceptance of the offer, and consideration. Krebs v. Strange, 419 So.2d 178, 181 (Miss.1982). We find that HLC was not contractually bound to Service Electric. While HLC did agree to issue joint checks for any materials which Service Electric sold to Magnum for the project, Service Electric had no return obligation to HLC to sell materials to Magnum. Had Service Electric chosen to stop selling materials to Magnum, or had declined to sell Magnum any materials whatsoever, HLC would have had no recourse in contract. Consequently, there was no mutuality of obligation between HLC and Service Electric and, thus, no contract.[3]See United Elec. Corp. v. All Serv. Elec., Inc., 256 N.W.2d 92, 95 (Minn. 1977).
¶ 18. Service Electric argues that a unilateral contract existed because the February 20 letter was an offer by HLC to pay Service Electric for all materials ordered by Magnum and to pay by joint check. Service Electric contends that it accepted this offer by performance in the form of selling goods to Magnum, thus creating a unilateral contract. Service Electric contends that the goods it sold to Magnum constituted consideration supporting its agreement with HLC.
¶ 19. We disagree. Service Electric's sale of goods to Magnum was not consideration to support a contract between HLC and Service Electric. Under the HLC-Magnum construction contract, HLC was to pay Magnum for materials used in the project. The February 20 letter was an agreement between HLC and Magnum as to how HLC would pay Magnum for materials *870 for which it owed payment to Magnum under the contract.
¶ 20. Magnum had an open account with Service Electric. An open account is an unwritten contract. McArthur v. Acme Mechanical Contractors, Inc., 336 So.2d 1306, 1308 (Miss.1976). It "is a type of credit extended through an advance agreement by a seller to a buyer which permits the buyer to make purchases without a note of security and is based on an evaluation of the buyer's credit." Cox v. Howard, Weil, Labouisse, Friedrichs, Inc., 619 So.2d 908, 914 (Miss.1993).
¶ 21. As noted, Magnum was behind in its payments on the account and Service Electric refused to sell any further materials to Magnum without a promise to issue joint checks from the owner of the project for which the materials were intended. Magnum secured the joint check agreement from HLC, and, in reliance on that agreement, Service Electric began selling materials to Magnum. Nonetheless, in shipping materials to Magnum, Service Electric was simply performing its contract with Magnum under which Service Electric sold materials to Magnum on open account. A party's performance of its obligations under a contract does not function as consideration supporting a different agreement. Leggett v. Vinson, 155 Miss. 411, 418, 124 So. 472, 473 (1929). Thus, Service Electric's shipment of materials to Magnum pursuant to its contract with Magnum was not consideration to support a contract between Service Electric and HLC. We discuss the implications of Service Electric's reliance upon HLC's promise to issue joint checks in Issue II.
¶ 22. Since no contract existed between HLC and Service Electric, the latter stands as a general creditor of Magnum. Chancellor, 211 Miss. at 598, 52 So.2d at 364. As previously discussed, Service Electric could have recovered payment from any funds which HLC owed Magnum by serving HLC with a stop notice pursuant to § 85-7-181. While Service Electric has not renewed its quantum meruit argument on appeal, we observe that, since Service Electric's contract for sale of goods was with Magnum, it could not recover from HLC on that basis. See Holmes v. Shands, 26 Miss. 639, 641 (1854) (stating that ["the owner's] implied liability that would arise generally from his receiving value from the party furnishing [materials], is taken away by the special contract [the owner] has made [with the prime contractor], and especially by the special contract which [the material supplier] has made with the person with whom the owner of the property has contracted to complete the work").

II. ALTERNATIVELY, IS HLC ESTOPPED FROM DENYING ITS LIABILITY TO SERVICE ELECTRIC?
¶ 23. Service Electric argues that, even if there was no contract between it and HLC, HLC was estopped by its representations from denying its liability to Service Electric. The doctrine of promissory estoppel holds:
an estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetuation of fraud or would result in other injustice.
C.E. Frazier Constr. Co. v. Campbell Roofing and Metal Works Inc., 373 So.2d 1036, 1038 (Miss.1979). The purpose of the doctrine of promissory estoppel is to "forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon." Koval v. Koval, 576 So.2d 134, 137 (Miss.1991). The *871 doctrine is "a rule of justice which prevails over all other rules" and may, where applicable, "operate to cut off a right or privilege conferred by statute or even by the constitution." Id. "However, estoppel should only be used in exceptional circumstances and must be based on public policy, fair dealing, good faith, and reasonableness." Powell v. Campbell, 912 So.2d 978, 982(¶ 12) (Miss.2005) (citing PMZ Oil Co. v. Lucroy, 449 So.2d 201, 206 (Miss.1984)).
¶ 24. Service Electric claims an estoppel arose because, in shipping materials to Magnum, it detrimentally relied upon HLC's promise "to pay for materials used on our project NO. 699-01 by joint check." There are two aspects to Service Electric's detrimental reliance argument that focus upon the interpretation of the preceding language from the February 20 letter. Service Electric argues that the import of the language was (1) that HLC promised to pay for all materials ordered and (2) that HLC promised to pay for said materials by joint check. HLC argues that the letter only promised to use joint checks as the method of payment to Magnum for his materials bills, and was not a promise to pay for all materials which Magnum ordered.
¶ 25. A review of the entirety of the language in the February 20 letter indicates that the letter was ambiguous. It is impossible to discern from the language of the letter whether HLC promised to pay for all materials used in the project, or simply promised to issue joint checks as a method of payment to Magnum for materials. However, due to the contractual relationships between HLC and Magnum and between Magnum and Service Electric, Service Electric could not reasonably have construed the letter as HLC's agreement to pay for all materials ordered. Service Electric knew that HLC's construction contract was with Magnum and that Magnum would sell HLC all electrical supplies used in the project. Since HLC had a contract for parts with Magnum, Service Electric could not reasonably have construed the letter to signify that HLC would buy parts directly from Service Electric. Further, Albritton's undisputed testimony indicated that he told Stickell it was not HLC's intent to directly purchase materials from Service Electric. Rather, if Service Electric so elected, Service Electric could sell materials to Magnum on open account. For these reasons, it would have been unreasonable for Service Electric to construe the letter as HLC's promise to pay for all of the materials which Magnum ordered from Service Electric.
¶ 26. Albritton's testimony shows that what HLC did intend for Service Electric to rely upon, and what Service Electric did rely upon, was HLC's promise to issue joint checks to Magnum when Magnum presented HLC with a bill for parts from Service Electric. It was undisputed that Service Electric would not extend credit to Magnum without this assurance from HLC. When Magnum relayed Service Electric's position to HLC, HLC gave Service Electric a written assurance that it would issue joint checks. Service Electric relied upon HLC's assurance by selling parts to Magnum on open account. Then, HLC issued joint checks as promised.
¶ 27. Service Electric argues that it relied on HLC's assurance to its detriment because HLC made one check for $13,787.05 payable to Magnum alone. Indeed, Albritton admitted that the check was intended to have been made jointly payable to Magnum and Service Electric. Magnum cashed the check and absconded with the funds which it owed Service Electric. HLC knew that the reason Service Electric requested that HLC issue joint checks was to protect itself from the occurrence *872 of this exact event. Thus, Service Electric did incur detriment from HLC's failure to issue a joint check as promised.
¶ 28. HLC argues that Service Electric had an opportunity to cure the detriment it suffered from HLC's failure to issue a joint check. HLC points out that Albritton told Stickell that HLC would withhold payment to Magnum until Magnum paid over the $13,787.05 to Service Electric. In fact, Magnum gave Stickell a check, Stickell assured Albritton that Service Electric had been paid, and HLC resumed payments to Magnum.[4] Then, Stickell found out from the bank that Magnum's account had insufficient funds to cover the check, and Stickell complained to HLC that Service Electric had not been paid after all. HLC argues that Service Electric should have assured itself that Magnum's check was good before inducing HLC to release funds to Magnum.
¶ 29. For estoppel, "the test is whether it would be substantially unfair to allow a person to deny what he has previously induced another to believe and take action on." Koval, 576 So.2d at 138. We have found that HLC intended for Service Electric to rely upon a promise to issue joint checks and that Service Electric reasonably relied upon the promise to its detriment. However, any injustice that resulted from HLC's failure to issue a joint check was abrogated by Service Electric's negligent failure to assure itself that Magnum's check was good before notifying HLC that it could release funds to Magnum. HLC resumed paying Magnum in reliance upon Service Electric's assurance that it had been paid the $13,787.05. In this circumstance it would be inequitable for HLC to be made to pay twice. We affirm the grant of summary judgment in favor of HLC.

III. SHOULD THE TRIAL COURT HAVE GRANTED SERVICE ELECTRIC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND ENTERED A JUDGMENT FOR SERVICE ELECTRIC IN THE AMOUNT OF $13,787.05?
¶ 30. We have disposed of this assignment of error under Issue II.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF COPIAH COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., BARNES, ISHEE, ROBERTS, JJ., CONCUR. SOUTHWICK, J. CONCURS IN RESULT ONLY. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, J.
IRVING, J., dissenting.
¶ 32. I cannot agree that summary judgment was properly granted to Hazlehurst Lumber Company, Inc. (HLC), because the record clearly reflects that there are genuine issues of material facts. Additionally, contrary to the holding of the majority, there is ample evidence to support a finding that a contract existed between HLC and Service Electric Supply Company, Inc. (SESCO). Therefore, for the reasons set out below, I respectfully dissent. I would reverse and render the summary judgment rendered in favor of HLC and remand this case to the trial court for a full trial on the merits.
¶ 33. The central holding of the majority opinion is that, notwithstanding HLC's *873 breach of its promise to SESCO, SESCO's own negligence prevents it from prevailing. The factual underpinning for the majority's holding is the premise (1) that there is no dispute that HLC offered to rectify the damage caused by its breach, (2) that SESCO assured HLC that SESCO had been made whole, and (3) that only after this assurance did HLC again make checks payable to Magnum Industrial Power and Controls, Inc. (Magnum) without SESCO being included as a co-payee.[5] As will be demonstrated from quoted passages of SESCO's Rule 30(b)(6) deposition, submitted in support of HLC's motion for summary judgment, the majority's working premise is clearly erroneous.
¶ 34. I first discuss some facts not included in the majority opinion, which, in my view, are material and indicative of why the grant of summary judgment was improper.
¶ 35. Sometime prior to February 20, 1998, HLC and Magnum entered into a contract, which obligated Magnum to construct a new logging plant for HLC. However, Magnum could not obtain the materials for the project. It wanted to buy them from SESCO, presumably on an open account, but SESCO would not agree unless the owner of the project (HLC) agreed to make payments for materials used on the project payable jointly to SESCO and Magnum.[6]
¶ 36. Magnum contacted HLC and asked if HLC would make the payments jointly to SESCO and Magnum, as required by SESCO. HLC agreed and sent the following letter to Herbert Larry Stickell, owner of SESCO, and to Ronnie Rogers, owner of Magnum:
To: Terry Stickels [sic] and Ronnie Rogers
Hazlehurst Lumber Company agrees to pay for materials used on our project NO. 699-01 by joint check. The check will be made to Service Electric Supply and Magnum Industrial Power and Controls. This in no way affects the responsibility of Magnum to perform to the bid specifications (dated 1/20/98) and does not in any way alter the purchase order currently in place.
 Starke Albritton,
 Operations Manger
 Hazlehurst Lumber Company[7]
¶ 37. After receiving the letter from HLC, SESCO provided materials for the project and was paid at least three payments in accordance with HLC's commitment under the letter. However, on either June 5 or 8, 1998, HLC issued a materials and supplies check for $13,787.05 payable to Magnum only. This check was for an invoice dated April 16. An invoice for $27,402.68, dated June 1 was also forwarded to HLC. On July 7, HLC issued a check for $6,259.40 payable to Magnum only.
¶ 38. The majority finds that, on these facts, the doctrine of promissory estoppel applies and that SESCO relied to its detriment on HLC's promise to issue joint checks for all materials and supplies provided by SESCO. I agree. However, since the majority addresses only the $13,787.05 check issued without SESCO *874 being included as a payee, I briefly defer my discussion of the matter of the $13,787.05 check to address the totality of the issues raised in the court below.
¶ 39. SESCO sued HLC for $47,207.40 for materials delivered to the HLC project. When HLC filed for summary judgment, SESCO denied that HLC was entitled to summary judgment and moved for partial summary judgment in its favor on the $13,787.05 check HLC had issued in violation of HLC's promise to make all checks jointly payable to SESCO and Magnum. SESCO never abandoned its claim that it was entitled to the balance of the $47,207.40, or $33,420.35. It just did not seek summary judgment on that amount. Since the majority finds that promissory estoppel is applicable to the $13,787.05 check, I cannot understand its reasons for not addressing the applicability of promissory estoppel to the total of SESCO's claim.
¶ 40. I return to a discussion of the $13,787.05 check. The majority finds that "any injustice that resulted from HLC's failure to issue a joint check was abrogated by Service Electric's negligent failure to assure itself that Magnum's check was good before notifying HLC that it could release funds to Magnum. HLC resumed paying Magnum in reliance upon Service Electric's assurance that it had been paid the $13,787.05."[8] Majority opinion at (¶ 29).
¶ 41. With respect for my colleagues in the majority, I must say that the summary judgment record presented here demonstrates unquestionably that there is a genuine issue regarding whether SESCO ever informed HLC that SESCO had been paid the $13,787.05 and that HLC could release funds to Magnum. The majority says that this allegation was established as a fact by Albritton's deposition testimony, that it was not refuted by any evidence submitted by SESCO, and that Stickell never denied making the statement to Albritton. Although Stickell was not specifically asked if he told Albritton that SESCO had been paid, he was asked whether he had a conversation with Albritton in which Albritton stated that Albritton would withhold other monies from Magnum to make the $13,787.05 check good. Stickell's answer to that question was that no such conversation occurred. The key issue is what did HLC do or offer to do to cure the damage caused by its breach of its obligation to issue checks payable jointly to SESCO and Magnum for materials used on HLC's project. On this key issue, there is a dispute. HLC says it offered to withhold other monies from Magnum, and SESCO says no such conversation occurred.
¶ 42. Also, the majority's says that after "Stickell found out from the bank that Magnum's account had insufficient funds to cover the check, and Stickell complained to HLC that Service Electric had not been paid after all." Majority opinion at (¶ 28). That is a true statement, but in the context used by the majority, is misleading. According to Stickell's deposition testimony, after being given the check by Magnum, he immediately called the bank and found out that the check was no good.
¶ 43. The Rule 30(b)(6) deposition of Herbert Larry Stickell, which was made an exhibit to HLC's motion for summary *875 judgment, reveals the disputed material facts. I quote liberally from it:
Q. Now, did you have the conversations with Starke[9] about 
A. About this check?
Q.  what to do about that? Yes.
A. Right.
Q. All right. What 
A. He said 
Q. What was said?
A. There at the end he said, "Well, I paid him. You're going to have to collect from him."
Q. Well 
A. It's in these notes right here.
Q. What was said before then?
A. He said, "You're going to have to get your money from him."
Q. Well, now, you've heard him testify  or you know his deposition says that you told him, told Starke Albritton to go ahead and release monies to Magnum, otherwise he'd offered to make it good and hold out the money 
A. Do what, now?
Q. (*)[10] send to you.
A. (*) Tell me that again, what you said.
Q. Did you ever have a conversation with Starke Albritton where he said he would make the [$]13,000 good by holding out other monies from Magnum for you?

A. No, no.

Q. All right. Tell me what you and Starke Albritton did say to each other about Exhibit 35.[11]
A. The only thing  I kept trying to get this money 
Q. From whom?
A.  and it was getting it  from Magnum.
Q. Right.
A. It was getting it from Magnum.
(Emphasis added)
¶ 44. Also, as previously stated, the record does not reflect that the check given to SESCO by Magnum was returned for insufficient funds. A balanced and fair reading of the record reveals that after SESCO received the check, SESCO checked with the bank and learned that there were not sufficient funds in Magnum's account to cover the check. Thereafter, SESCO continued to call the bank on a daily basis to see if the account ever possessed sufficient funds to cover the check. This is what the record reflects on this point:
Q. All right. Then at 30 we're asking for any information, now, not just documents but anything you know about communications between agents for SESCO, not just you but anybody working for you, agents of Magnum, not just Ronnie, if there's somebody else, and SESCO and Hazlehurst Lumber or their agents, any of you folks in the three reflecting how to process and account for this $13,000 check, we've been calling it, the $13,878.05, check No. 3904. Anyone else talk about how to process that check, what agreements were made, what conversations were had? Tell me about the $13,000 check.
A. Check wasn't no good.

*876 Q. Well, that's the check you got from .
A. Anyway, the check was supposed to have been made out to SESCO and Magnum or Magnum and SESCO. It was supposed to be a joint pay.
Q. So you said you got the check from Magnum, and it was no good. Did you try to run it through more than once?

A. I called every day for three months on it, because if it was there I was going to run and get it. But let me start back 
Q. Did you ever 
A.  let's make sure 
Q.  get payment on that check 
A. No.
Q.  are you still holding that check?
A. No, I didn't never get it. Yeah, I got that check.
Q. You still have it in your physical 
A. It's bad.
Q.  possession. It came back from the bank stamped INS?

A. No, it did not come back from the bank non-sufficient funds.

Q. You're holding it in your drawer. Where is the check?
A. I got it.
Q. You got it.
MS. PAYNE: Could we get a copy of that?
MR. HENDERSON: That's fine.
A. But the check, getting back to the answer, the check was suppose to have been made out joint pay, and it was not made out joint pay. The computer at Hazlehurst made a error.
BY MS. PAYNE:
Q. Now, did anyone else have any conversations about this check from SESCO other than you?
A. Carol Bates heard the conversation, my end, with Starke Albritton.
Q. Did she talk to anyone directly? Did Carol Bates talk to anyone at Magnum 
A. She was trying to help me get the check made good. And I was calling Magnum, and she was calling the bank. And I called the bank everyday to see if the check was good.

Q. Did she call Magnum too?
A. She called the bank.
Q. Just the bank. Did anyone else keep calling Magnum for you trying to get the payments 
A. I tried 
Q.  were there any other communications?
A. And you can see  I got some correspondence, I think, on the check trying to get them to pay the check.
MS. PAYNE: We'd like 
A. You know, in the state of Louisiana 
MS. PAYNE  copies of that correspondence, because we're trying to find out what if it's made 
MR. HENDERSON: Correspondence to who? What do you mean by "correspondence," Larry?
THE WITNESS: The correspondence  I called him several times. I even called Starke back and told him that he was going to send me a check on his account when the joint pay wasn't there. I called Starke back and let him know the damn check wasn't no good.

BY MS. PAYNE:
Q. And that would have been about June of '98?
A. That would have been shortly after he gave me the check because it *877 wouldn't have took it long to have been processed. We can 

Q. After Ronnie 
A.  we can 
Q.  gave you the check.
A. We can look at his check date. Okay? And it was shortly after that period when Starke told me this is the check, but the computer made the error. You know, it wasn't no person sitting there making the error. The computer made the error and didn't put our name on it.

¶ 45. I now turn to the issue of the contract. The majority finds that no contract existed between SESCO and HLC because of a lack of consideration. The majority states that "in shipping materials to Magnum, Service Electric was simply performing its contract with Magnum under which Service Electric sold materials to Magnum on open account." Then, citing Leggett v. Vinson, 155 Miss. 411, 124 So. 472, 473 (1929), the majority opines that "[a] party's performance of its obligations under a contract does not function as consideration supporting a different agreement." Majority opinion at (¶ 21).
¶ 46. Here again, the majority's working factual premises are erroneous. There was no separate contract between Magnum and SESCO, obligating SESCO to provide materials to Magnum on an open account. If that were the case, Magnum would not have needed HLC's assistance. Magnum just could have enforced its contract. That no contract existed between Magnum and SESCO is made amply clear by the following excerpts from Stickell's deposition:
Q. So how did it come to your attention that you were [$]20,000 in the hole on that job [referring to a previous job by Ronnie Rogers of Magnum]?
* * * *
A. Well, I look at every statement before it goes out, and here comes this job up. And then finding out the name of the job and finding out it was Rogers, it was a difficult time. And I never heard from Rogers until they wanted to do this job here [the HLC job]. And I told him, I said no way. He said if  he said, "I'm doing it for a good company, and if I can get it agreed to do joint pay, would you be interested in it?" I said yeah but that I'd have to have something in writing on a joint pay before-I would do it.

* * * *
Q. Is it fair to say that you had your conversation with Ronnie Rogers before February 9 of 1998?
A. I should have, because  now, he may have come up and bid and gave Starke a price at that time without even getting a price from us, you know. It's hard to remember exactly what transpired five years ago to the dates. But I do know this: I told him before I would sell him anything on a job that he had to get me a letter where his customer would agree to joint payment or I would not sell him.

* * * *
Q. When was the first time you ever talked to Starke Albritton, near as you can figure it?
A. Now this is speculation, but I might have made sure this letter was good.
Q. And you're referring to No. 24.
A. Yeah.
Q. So when you got 24 in your hands, you had the letterhead from Hazlehurst *878 Lumber, it's got the phone number, you could pick up the phone and say, Hey, is this real?"
A. Well, I mean, I'm saying that, and it may or may not be so. Okay? But I know this: Before I would have sold [to Ronnie Rogers of Magnum], I would have had to have this, and I would have confirmed it more than likely in some kind of way.

Q. And "this" being No. 24.
(Emphasis added)
¶ 47. The quoted passages clearly demonstrate that Magnum had no separate contract with SESCO whereby SESCO was obligated to furnish Magnum materials on an open account. Rather, the passages prove that there was a contract between SESCO, Magnum and HLC. The shipping of materials by SESCO constituted acceptance of HLC's promise to pay for the materials by making its check payable jointly to Magnum and SESCO. It also constituted consideration flowing to HLC, as HLC could now be assured that its project would get underway by its chosen contractor, which theretofore did not have the materials to perform the project. Such assurance was sufficient consideration for HLC's promise to make joint checks for payment of the materials. It is speculation as to whether Magnum could have obtained the materials from another supplier on an open account. For our purposes, it is sufficient that that option, if available, was never pursued. Therefore, there is no need to address this issue.
¶ 48. In summary, I would reverse and remand this case to the trial court for trial, not only on SESCO's entitlement to the $13,787.05, but also on its entitlement to the entire amount for which suit was brought. There is a genuine issue of material fact regarding the $13,787.05 check, that is, whether SESCO told HLC that SESCO had been paid and that HLC could release funds directly to Magnum. From my reading of the record, I find that, as to the remaining $33,420.35, there is also a dispute as to whether the materials which are reflected in the invoices comprising the $33,420.35 figure were in fact used on HLC's project.
¶ 49. For the reasons discussed, I respectfully dissent.
GRIFFIS, J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Stickell testified that, at the inception of the HLC project, Magnum already owed Service Electric approximately $25,000 for prior materials purchases.
[2] An August 18, 1998 letter from HLC to Magnum was partially read into Albritton's deposition. In the letter, HLC communicated that it would make no further payments to Magnum until Magnum paid Service Electric the $13,787.05.
[3] In United Electric, the Minnesota supreme court reached this result concerning an analogous joint check arrangement. United Elec. Corp., 256 N.W.2d at 95. We consider this result to be a sound one that reflects the intent of the parties sub judice as well as the business practices of the construction industry in Mississippi.
[4] This was established by Albritton's deposition testimony and unrefuted by any evidence submitted by Service Electric. In his deposition, Stickell never denied telling Albritton that Service Electric had been paid.
[5] As will be discussed more fully later in this opinion, HLC agreed to make joints checks to SESCO and Magnum for materials supplied by SESCO for use on HLC's building project. However, HLC breached its promise, making one check for $13,787.05 payable to Magnum only. SESCO never recouped the $13,787.05.
[6] At the time, Magnum owed SESCO $20,000 for supplies furnished to Magnum on another project unrelated to HLC.
[7] This letter was exhibit 24 of the various exhibits presented in the summary judgment proceedings.
[8] It is interesting that the majority would cite HLC's August 18, 1998 letter to Magnum as evidence of HLC's contention that it promised to withhold further payments to Magnum until Magnum paid SESCO the $13,787.05. The record does not indicate that any payments were made to Magnum after August 18. However, the record reflects that several payments were made to Magnum only after SESCO's invoice for the $13,787.05, which was sent in April.
[9] Starke refers to Dan Stark Albritton, Jr., part owner and operations manager, of HLC.
[10] (*) indicates that a portion of the question is obliterated as a result of holes being punched at the top of the page for binding purposes.
[11] Exhibit 35 is a copy of the $13,787.05 check